**The PEOPLE of the State of Colorado, Complainant,**

v.

**William D BONTRAGER, Respondent.**

**Case Number: 16PDJ038**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

April 20, 2017

26. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of

C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

27. *See* "Status Report Re: Amount of Restitution Owed" at 1.

1238

Please see the full opinion below.

## OPINION AND DECISION IMPOSING SANCTIONS UNDER C.R.C.P. 251.19(b)

WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE

William D. Bontrager ("Respondent") engaged in misconduct while litigating the oil and gas leases of five separate clients. He failed to act competently during the representations, and he advanced frivolous claims during four of the litigations and four appeals. He caused his clients considerable financial harm and wasted judicial resources. His misconduct warrants a nine month suspension, with the requirement that he pay restitution to his clients before petitioning for reinstatement under C.R.C.P. 251.29(c), if he wishes to resume the practice of law.

## I. PROCEDURAL HISTORY

On April 29, 2016, Erin R. Kristofco, Office of Attorney Regulation Counsel ("the People"),[1] filed a complaint with Presiding Disciplinary Judge William R. Lucero ("the PDJ"), alleging that Respondent incompetently represented five individual clients and advanced meritless claims on their behalves. The People also claimed that he lodged a frivolous suit in one pro se matter. These actions, the People claimed, resulted in prejudice to the administration of justice.

On May 31, 2016, Respondent filed a combined motion to dismiss along with his answer and affirmative defenses, asking the PDJ either to dismiss the People's complaint in its entirety for failure to state a claim or, in the alternative, to order the People to replead their complaint with more particularity. On August 15, 2016, the PDJ denied that motion in part as to Respondent's representation of his five clients. But the PDJ ordered the People to make a *prima facie* showing under *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. ("POME")* [2] that Respondent's pro se litigation conduct should not be protected by his First Amendment right to petition.

Respondent asked for reconsideration of this ruling, but the PDJ denied his request. The People then moved to dismiss the allegations in their complaint concerning Respondent's pro se litigation, found in paragraphs 122-127 and Claims III and IV of the complaint. The PDJ granted the People's request on August 31, 2016. On that same day, the PDJ issued a scheduling order and set the hearing for January 17-20, 2017.

During the prehearing phase of this matter, the parties filed numerous motions. The Hearing Board briefly limns these motions as follows:

- On September 23, 2016, the PDJ denied Respondent's request to continue the hearing, permitted the parties to take six additional depositions, and ordered the parties to file an advisement to potential hearing board members so they could make an informed decision about recusal.

- On October 26, 2016, the PDJ declined to declare, at Respondent's request, a Colorado statute unconstitutional; clarified the People's burden of proof; ruled that the People need not meet the standards set forth in *POME* for claims involving client representations; and denied Respondent's request to exclude from evidence all district court orders and appellate opinions in the underlying cases.

- On November 18, 2016, the PDJ granted Respondent an extension of time to exchange with the People his expert witness reports.

- On December 9, 2016, the PDJ ordered the People to give Respondent a bookmarked, searchable CD of the stipulated exhibits and corresponding exhibit list; denied Respondent's request to continue the hearing; and ordered the parties to present their stipulated exhibits in electronic form.

- On December 20, 2016, the PDJ denied Respondent's request for sanctions based on his objections to the People's experts, Thomas H. Shipps and

1. Kim E. Ikeler also entered his appearance for the People on August 31, 2016.

2. 677 P.2d 1361 (Colo. 1984).

Thomas P. Dugan. The PDJ also precluded Respondent's expert witness H.J. Ledbetter from opining on pure issues of law governing the disciplinary hearing and on certain issues that would not assist the Hearing Board.

- On December 22, 2016, the PDJ denied Respondent's requests to continue the hearing and to order the People to bookmark or index each individual document in the proposed stipulated exhibits or to order individual transcripts of the sanctions hearings in the underlying cases.

- On December 27, 2016, the PDJ directed the parties to file a modified trial management order by January 9, 2017, listing their proposed trial schedule, and limited the parties' opening arguments to fifteen minutes and closing arguments to twenty-five minutes.

- On January 4, 2017, the PDJ granted Respondent's request to file a hearing brief in excess of thirty pages and struck Respondent's exhibits to his hearing brief, including expert witness George Miller's report.

- Before the hearing, the PDJ granted the People's requests to permit absentee testimony from Judge David A. Cole, Judge David L. Dickinson, and Judge Jeffrey R. Wilson.

- On January 6, 2017, the PDJ accepted the parties' stipulation of exhibits 1-980. In so doing, the PDJ ruled that any trial court orders or appellate court opinions would not be admitted for the truth of the matters asserted therein.

- On January 9, 2017, Respondent filed a motion to proceed *in forma pauperus*, asking not to be assessed costs in this disciplinary matter. The People were to file a response by January 24, 2017, but they did not do so. The PDJ deferred ruling on Respondent's motion.

On January 10, 2017, the PDJ held a prehearing conference. Kristofco and Ikeler appeared for the People, and Respondent appeared by telephone. The PDJ also ordered the parties to submit a stipulated timeline of events in the underlying litigations, which they did on January 13, 2017.

At the January 17-20 hearing, the PDJ presided, along with Hearing Board members Lucy Hojo Denson, Esq., and Robert A. Munson, M.D. Kristofco and Ikeler represented the People, and Respondent appeared pro se. During the hearing, the PDJ admitted stipulated exhibits S1-S1009, the People's exhibit 1010, Respondent's stipulated exhibits A-H, L, HH, and II, and his nonstipulated exhibits J, K, OO, and PP. The Hearing Board considered the testimony of the People's expert witnesses Thomas P. Dugan and Thomas H. Shipps, Respondent, Judge Jeffrey R. Wilson, Judge David L. Dickinson, Judge David A. Cole, Judge David R. Lass, and Respondent's expert witnesses G. Robert Miller and H.J. Ledbetter.

## II. FACTS AND RULE VIOLATIONS

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on March 17, 2004, under attorney registration number 35359. He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.[3]

### Background[4]

Respondent received his J.D. from the University of Indiana in 1966. That same year he was admitted to practice law in Indiana. He opened his own general litigation firm, and his practice included civil litigation, business law, juvenile law, and criminal law. He did not practice in the areas of oil and gas, class actions, or Indian law, though he did settle tort claims. In 1977, Respondent was appointed as an Indiana Superior Court judge. He served until 1982, when he was held in criminal contempt by the Indiana Supreme Court. While a judge, Respondent

---

3. *See* C.R.C.P. 251.1(b).

4. Where not otherwise noted, these facts are drawn from testimony offered at the disciplinary hearing.

heard civil, criminal, juvenile, and probate cases, although he never approved settlement agreements submitted by parties. After leaving the Indiana bench, Respondent spent one year as a solo practitioner, primarily in criminal defense.

In 1983, Respondent put his Indiana law license on inactive status. He and his wife moved to Minnesota, where he became the director of a Christian conciliation ministry service. There, he mediated disputes using secular and biblical principles. He testified that at that time, he was very troubled by the quality of justice rendered by secular litigation. The couple moved in 1988 from Minnesota to Durango, Colorado, where they "freelanced" their ministry services, while helping people to resolve conflicts.

The couple moved to Moscow in 1994 to teach law and English at two universities, where Respondent compared biblical conflict resolution principles and the laws and legal processes of modern society. He also developed and taught courses in criminal law, contracts, civil procedure, constitutional law, property, and equity. After leaving Moscow, Respondent and his wife lived in various other places abroad before returning to the United States in 2002 for health reasons.

In 2002, Respondent's wife's back "collapsed." They spent a great deal of time trying to finance medical care, and Respondent decided to return to the practice of law. In 2004, he was admitted as a Colorado lawyer and opened a solo practice in Durango, initially planning to draft wills or practice civil and criminal litigation. But he became intrigued with oil and gas litigation after speaking with three mineral rights owners whom, he believed, were owed royalties from various oil companies. According to Respondent, he successfully settled their cases by attacking the constitutionality of Colorado's forced pooling statute. Thereafter, he testified, he began to see "a pattern" in which the oil companies failed to develop leaseholds as they were required to do, and he was motivated to assist lessees with these issues.

The People charge Respondent with misconduct in five separate client cases. We address each of the cases below.

## The Adams Case

In 1931, Wallace Mollette acquired an undivided 1/40th mineral interest (or four mineral acres) in a 160-acre tract of land in La Plata County.[5] On May 15, 1931, Mollette deeded this interest to Charles Werner.[6] The terms of the warranty deed provided that Mollette, Werner, and their successors would share payments under an oil and gas lease.[7] Werner did not immediately record his warranty deed; instead, he waited to do so until September 26, 1952.[8]

In the interim, on August 22, 1950, Mollette and the Hathaway Company signed an oil and gas lease that covered Werner's 1/40th interest.[9] This ten-year lease required Mollette to notify Hathaway in writing if he transferred his ownership in the land or in rents or royalties.[10] This lease was recorded in La Plata County.[11] In 1951, the Colorado Oil and Gas Conservation Commission ("COGCC") granted Hathaway a permit to drill a well, which began producing gas in 1952.[12] Hathaway did not learn of Werner's interest in 1950 because the warranty deed had not been recorded, and Hathaway was not otherwise notified of Werner's interest. As a result, Hathaway paid Mollette and his successors royalties from the oil and gas lease; it did not pay any royalties to Werner or his successors. In 1955, Hathaway applied for a permit to drill a second well on the land in a different formation.[13]

5. Ex. S3 at 01063. During this proceeding, the parties never disputed the underlying facts in the Adams litigation.

6. Ex. S3 at 0106; Ex. S58 at 01438-39.

7. Ex. S58 at 01438.

8. Ex. S3 at 01063; Ex. S37 at 01271.

9. Ex. S3 at 01063.

10. *See* Ex. S58 at 01438-39.

11. Ex. S37 at 01270-71; Ex. S58 at 01465-66 (oil and gas lease).

12. Ex. S3 at 01064; Ex. S37 at 01271.

13. Ex. S3 at 01064.

In 2008, Penny Adams and Timothy Werner—Werner's successors—were given the title to Werner's 1/40th mineral interest in a probate court matter.[14] This order was recorded.[15]

On December 15, 2008, Respondent filed a complaint for Penny Adams and Timothy Werner based on Charles Werner's unrecorded deed and the 1950 oil and gas lease.[16] He brought suit against defendants Red Mesa Holdings LLC, Madison Capital Company LLC, Star Acquisition LLC, and Terra Exploration and Production Company.[17] (Terra took over production from Hathaway in 2000; Star took over in 2006; Madison took over in 2007 and then created Red Mesa to continue production).[18] Thomas P. Dugan represented the defendants.[19] He also testified at this disciplinary hearing as the People's expert witness. Respondent sought back payments for the gas production.[20]

On January 12, 2009, Red Mesa and Madison Capital filed motions to dismiss[21] based on C.R.S. section 38-35-109, which states in pertinent part:

> All deeds . . . or other instruments in writing conveying, encumbering, or affecting the title to real property . . . may be recorded in the office of the county clerk and recorder of the county where such real property is situated. . . . No such unrecorded instrument or document shall be valid against any person with any kind of rights in or to such real property who first records and those holding rights under such person, except between the parties thereto and against those having notice

thereof prior to acquisition of such rights. This is a race-notice recording statute.[22]

On March 10, 2009, the court converted the defendants' motions to dismiss to motions for summary judgment, and ordered the parties to produce evidence that Hathaway had actual knowledge of Werner's mineral interest.[23] Respondent requested, and was granted on May 8, 2009, an additional forty-five days to conduct discovery for evidence of Hathaway's actual knowledge.[24]

Instead of submitting such evidence, Respondent filed on August 3, 2009, a cross-motion for partial summary judgment against Terra and Red Mesa.[25] In that motion, Respondent made no mention of the race-notice statute and instead argued, in part, that Hathaway had constructive or actual notice of Werner's mineral interest, and that Hathaway should have reexamined the title after applying in 1955 for the second permit, which would have led to discovery of Werner's interest.[26]

In late August, the court issued two orders dismissing the case as to all defendants.[27] The court concluded that Respondent had produced no evidence of Hathaway's actual knowledge of Werner's mineral interest.[28] The court also determined that Colorado's race-notice recording statute, adopted in 1927, precluded all of the plaintiffs' claims. The court reasoned that the statute exists to prevent the type of litigation that Respondent brought on his clients' behalf.[29] According to the court, Werner undisputedly recorded the deed after the 1950 oil and gas

14. Ex. S37 at 01281.

15. Ex. S37 at 01281.

16. Ex. S3.

17. Ex. S3. The case was styled *Adams et al. v. Red Mesa et al.*, case number 08CV338, La Plata County District Court. Respondent alleged three claims: 1) quiet of the mineral title, 2) conversion and to impress a trust, and 3) accounting and payment of monies due.

18. Ex. S38 at 01064.

19. *See* Exs. S7 & S8.

20. Ex. S3.

21. Exs. S7 & S8.

22. *C.R.S.* § 38-35-109(1). *Respondent later moved to dismiss Madison Capital.* Ex. S11.

23. Ex. S33 at 01225.

24. Exs. S48 & S53.

25. Ex. S58.

26. Ex. S58 at 01422-24.

27. Exs. S69 & S70.

28. Ex. S69 at 01651.

29. Ex. S69 at 01652.

lease was executed, and there was no evidence of Hathaway's actual knowledge of Werner's interest.[30]

The People's expert witness Dugan testified that when an individual has an interest in real property, that interest-holder must record the document with the applicable county clerk. In Colorado, if instruments conflict, the person who records his or her interest first prevails. Dugan also stated that the race-notice statute does not require a lessee to reexamine title during the terms of the lease, because the lessee is entitled to rely on the recorded title at the time the lease was executed. As Dugan explained, those principles are codified in the race-notice statute.

Dugan went on: when Hathaway and Mollette executed and recorded the oil and gas lease in 1950, Werner had not recorded, and thus Hathaway had no knowledge of his interest. According to Dugan, a reasonable lawyer would have applied the race-notice statute to the facts of the clients' case before bringing claims against the defendants. Dugan also stated that Respondent's claims had no basis in the law and were illogical because there is no legal mandate that an oil producer continually recheck title when applying for a new permit, given the race-notice statute. Further, Respondent failed to produce factual evidence to support his constructive or actual notice arguments, Dugan said.

Respondent's expert H.J. Ledbetter opined, on the other hand, that Respondent's arguments were not meritless because Hathaway should have conducted a new title search at the time it sought the second permit to drill in a new formation. While Ledbetter acknowledged that a producer is not legally required to reexamine title under these circumstances, he opined that it is the industry standard for an oil and gas producer to do so. Ledbetter explained that under Respondent's theory, a producer has a duty to reexamine title because the COGCC's creation of drilling spaces and declaration of how many wells can be drilled constitutes a Fifth Amendment taking of a person's right to compensation for the person's share of production. As a result, said Ledbetter, a producer is forced to pool any unleased minerals before seeking a drilling permit, and the producer should thus be required to undertake a new title search if royalties are being paid from a different spacing unit. Although Ledbetter opined that Respondent's arguments in the underlying case may not have been as "clear" as they could have been, he did not think Respondent's theory, based on the ancient rule of capture, was frivolous or groundless.

Respondent filed a notice of appeal on October 7, 2009, once again ignoring the race-notice statute.[31] His opening brief, filed on December 15, 2009,[32] contained a certification that he had complied with C.A.R. 28(k), although he had not.[33] In that brief, Respondent argued in part that Hathaway was not permitted to rely on the public record, "not just for authority to drill but also for making distribution of income forever" in light of information "then known or thereafter acquired."[34] He averred, in part, that the facts of his case presented issues of first impression in Colorado, specifically: (1) was Hathaway required to reexamine title to discover all mineral owners before paying royalties; and (2) was Hathaway required to pay royalties to other interest holders or to suspend payments once it had constructive notice of other unleased interests.[35]

The Colorado Court of Appeals affirmed the lower court's decision on June 10, 2010.[36] In that opinion, the appeals court determined that Respondent violated C.A.R. 28(k), because he did not cite the precise location in the record where his arguments were raised below and ruled on, and that he failed to

**30.** Ex. S69 at 01652.

**31.** Ex. S71 at 01654-65.

**32.** Ex. S107 at 15227-68.

**33.** C.A.R. 28(k)(1) (2009) (requiring a declaration of the applicable standard of review and a record reference to where the issue was preserved). This rule was revised in 2015.

**34.** Ex. S107 at 15241.

**35.** Ex. S107 at 15240-54.

**36.** Ex. S111.

preserve issues for appeal.[37] The court of appeals concluded also that his brief "contain[ed] numerous arguments that offered no rational analysis and wholly lack[ed] legal authority."[38] The court awarded attorney's fees and costs against Respondent individually.[39] Respondent settled with the defendants and paid them $30,000.00 in attorney's fees.

## Colo. RPC 1.1

The People argue that Respondent transgressed Colo. RPC 1.1, which provides that a lawyer shall provide competent representation to a client, when he filed his appeal without adequately analyzing the substantive and procedural aspects of relevant law.[40] His clients' claims were barred by the race-notice statute, argue the People, and the arguments he advanced had no legal basis in light of this long-standing Colorado authority.[41] His brief also failed to comply with the Colorado appellate rules, they say. In defense, Respondent referred the Hearing Board to Ledbetter's testimony.[42]

To determine whether a lawyer employs the requisite knowledge and skill in a particular case, we consider the following factors: the relative complexity and specialized nature of the case; the lawyer's general experience and training in the field in question; the lawyer's preparation and study; and whether the lawyer feasibly could associate with a lawyer of established competence in the field.[43] A lawyer competently handles a case when he or she makes inquiry into and analysis of the factual and legal elements of the problems and uses methods and procedures that meet the standards of competent practitioners.[44]

We find that Respondent's appeal in the Adams case did not meet applicable standards of competence. We make this determination without giving the findings of the court of appeals preclusive effect.[45] Rather, after considering the evidence presented at the hearing and the credibility of the witnesses, we independently find that the People proved their claim by clear and convincing evidence. We agree with Dugan's opinion that a competent lawyer would not have appealed the claims Respondent did, given the

---

37. Ex. S111 at 15348; Ex. S111 at 15355 (declining to consider Respondent's argument that the lease was void without Hathaway's signature because he did not point to the precise location in the record where the argument was raised and ruled on); Ex. S111 at 15356 (noting that Respondent cited no legal authority indicating that a lessee must reexamine title records before making first payments to owners under a lease, and noting that the race-notice statute protects an individual who properly records against unrecorded interests of which the individual had no notice); Ex. S111 at 15358-59 (rejecting Respondent's constructive notice argument because none of Respondent's factual allegations bore on whether Hathaway had notice of Werner's deed when it recorded its lease in 1950).

38. Ex. S111 at 15361.

39. Ex. S111 at 15361.

40. Compl. ¶ 130(a).

41. In their hearing brief, the People argue that Respondent violated Colo. RPC 1.1 on three additional grounds: (1) by incorrectly naming Madison Capital as a defendant; (2) by asserting a baseless alter ego claim against Madison Capital; and (3) by failing to join indispensible parties in the Adams case, specifically Mollette's successor, Kay Sherman. People's Hr'g Br. at 13-16. Dugan provided testimony about all three of these issues

at the hearing. These arguments, however, are not set forth in the People's complaint. The People's Colo. RPC 1.1 charge is limited to Respondent's appeal in the Adams matter concerning the race-notice statute. Compl. ¶¶ 2-13, 128-133. The People did not seek to amend their complaint to expand their Colo. RPC 1.1 claim. The Hearing Board thus does not consider these arguments as a basis for Respondent's rule violations, as a lawyer cannot be disciplined for charges of which he or she was not put on notice. See In re Green, 11 P.3d 1078, 1088 (Colo. 2000); In re Ruffalo, 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968).

42. Respondent's Hr'g Br. at 26-27.

43. Colo. RPC 1.1 cmt. 1.

44. Id. at cmt. 5.

45. See People v. Fitzgibbons, 909 P.2d 1098, 1104 (Colo. 1996) (finding the conclusions of the district court and court of appeals were evidence that the respondent's claims were frivolous and groundless); see In re Egbune, 971 P.2d 1065, 1067 (Colo. 1999) (noting that a trial court's ruling did not bind a hearing board because proof in civil actions typically is by a preponderance of the evidence, while in disciplinary proceedings proof is by clear and convincing evidence).

clear application of the long-standing race-notice statute. Under that statute, title priority goes to the party who first records his or her real property interest and who does not have notice that another person holds the same interest.[46] Both Werner's deed and Hathaway's lease were subject to the race-notice statute, and Werner's deed had not been recorded when Hathaway recorded its deed.[47] Respondent's failure to produce any evidence of Hathaway's actual or constructive knowledge of Werner's interest reflected a lack of thoroughness and preparation. To then appeal after failing to produce such evidence strikes us as incompetent. And it was thus unreasonable for Respondent to ignore the race-notice statute as it applied to his clients' claims on appeal. The term "reasonably" denotes the conduct of a reasonably prudent and competent lawyer.[48] Respondent's rationale as to why the race-notice statute did not apply to the Adams case, as explained by Ledbetter, is incomprehensible. There is no legal reason why the statute should be altered in application because of industry standards and forced pooling. Finally, Respondent's disregarded C.A.R. 28(k) evinces a level of procedural incompetence that we cannot ignore. Accordingly, we find that Respondent violated Colo. RPC 1.1.

### Colo. RPC 3.1

■ The People's second claim is premised on Colo. RPC 3.1, which precludes a lawyer from bringing or defending a proceeding, or asserting or controverting an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law. An objective standard is used to determine whether a lawyer's claim is frivolous.[49] "What is required of lawyers . . . is that they inform themselves about the facts of their clients' cases . . . and determine that they can make good faith arguments in support of their clients' positions." [50].

■ We agree with the People that Respondent violated Colo. RPC 3.1. Here, Respondent did not inform himself of the facts of his clients' case or the applicable law before filing suit, nor did he have any evidence of Hathaway's actual or constructive knowledge of Werner's deed. And when he was given additional time for discovery by the district court to produce such evidence, he could not do so.[51] Likewise, he could advance no cogent argument or produce legal authority supporting his assertion that Hathaway had a continuing duty to reexamine title under the circumstances. Yet he persisted with his arguments on appeal, despite lacking any factual or legal support for them. Thus, we conclude that Respondent advanced meritless claims in the Adams litigation and appeal in violation of Colo. RPC 3.1.

### Colo. RPC 8.4(d)

■ Last, the People charge that Respondent prejudiced the administration of justice, breaching Colo. RPC 8.4(d). According to the People, Respondent transgressed this rule by filing a frivolous complaint and appeal, causing actual injury to his clients, the defendants, and the courts. We lack persuasive evidence, however, that Respondent's conduct did indeed affect the judicial system to such a "serious and adverse degree" as to

---

46. C.R.S. § 38-35-109(1); *Page v. Fees-Krey, Inc.* 617 P.2d 1188, 1193 n.7 (Colo. 1980).

47. *See Tuttle v. Burrows*, 852 P.2d 1314, 1315-17 (Colo. App. 1992) (finding a mineral lease subject to the race-notice statute); *Page*, 617 P.2d at 1194 (noting that an oil and gas lease is an interest in real property).

48. Colo. RPC 1.0(h).

49. *In re Olsen*, 326 P.3d 1004, 1009 (Colo. 2014); *see also* Geoffrey C. Hazard, W. William Hodes & Peter R. Jarvis, *The Law of Lawyering*, § 30.12

(4th ed. 2015) (even under the objective standard, "some element of subjectivity remains," but discipline "should be imposed only if the lawyer persists in the error, or it is an error [not arising from] a single or simple mistake.").

50. Colo. RPC 3.1 cmt. 2.

51. *W. United Realty, Inc. v. Isaacs*, 679 P.2d 1063, 1069 (Colo. 1984) (finding a claim to be substantially groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial).

violate Colo. RPC 8.4(d).[52] Respondent's filings in the Adams case did not cause the courts to perform an unusual amount of work. Further, Respondent's failings in the Adams matter are adequately addressed in the other rule violations discussed above. Accordingly, we decline to find that Respondent violated this rule.

### The Martinez Matter

The Southern Ute Indian Tribe ("the Tribe") is a federally recognized Indian tribe located on the Southern Ute Indian Reservation in southwestern Colorado. In 1991, the Tribe, along with Red Willow, an oil and gas company considered a division of the Tribe, brought suit in Colorado federal court against Amoco Production Company, other oil and gas companies, and a class of landowners, among other defendants, to determine the Tribe's ownership rights to coal seam gas extracted from coal beds on the Tribe's land ("CBM case").[53] Thomas H. Shipps represented the Tribe and Red Willow in this litigation. He also testified at this disciplinary hearing as the People's expert witness.

According to Shipps, the CBM case eventually settled. Part of the settlement terms included an assignment, from the private oil companies to the Tribe, of a portion of the oil and gas lease mineral rights. In exchange, the Tribe agreed to withdraw its claims against the oil companies. Shipps explained that this settlement agreement also included a waiver of the Tribe's sovereign immunity in the event of a dispute between the Tribe and the defendant oil companies. Shipps also explained that the Tribe and Red Willow have sovereign immunity, which means that they are immune from suit. According to Shipps,

long-standing legal precedent upholds an Indian tribe's sovereign immunity unless the immunity is clearly abrogated by Congress or is expressly and unequivocally waived by the Indian tribe. In the CBM case, said Shipps, the Tribe did not waive sovereign immunity as to the defendant class members. The relevant language of that settlement agreement provided:

> The Tribe specifically surrenders its sovereign power, as to APC [Amoco Production Company], its parent company, BP Amoco p.l.c. and their respective Affiliates, shareholders, successors, and assigns, to the limited extent necessary to permit the enforcement of the terms of this Agreement.... The *Tribe's limited waiver of sovereign immunity in any legal action arising out of this Agreement* shall be further evidenced by a Tribal Resolution in accordance with Tribal Code § 1-1-115, which, among other things, shall expressly provide an exception to Tribal Code § 1-1-111, which states that tribal courts have exclusive original jurisdiction over all matters involving the Tribe, to the extent of the foregoing limited submission to the jurisdiction of the U.S. District Court for the District of Colorado. The Tribal Resolution shall waive any requirement under Tribal Code § 1-1-111 that actions arising under this Agreement be brought in tribal court or that tribal remedies be exhausted.[54]

In 1946, John Martinez, a landowner in La Plata County, entered into an oil and gas lease, which included certain mineral rights, with Paul Davis.[55] The Tribe had been assigned a portion of the lease and was making payments to the Martinez family through Red Willow.[56] On June 21, 2014, Respondent filed a case in La Plata County on behalf of

---

**52.** *In re Friedman*, 23 P.3d 620, 628 (Alaska 2001) (noting this rule "contemplates ... conduct which frustrates the fair balance of interests or 'justice' essential to litigation or other proceedings," and finding no violation where a lawyer's "conduct affected or potentially affected his clients and the other plaintiffs ... [b]ut it did not adversely affect litigation proceedings or a process fundamental to the administration of justice"); *In re Mason*, 736 A.2d 1019, 1023 (D.C. 1999) (to find a violation of RPC 8.4(d), the conduct must "at least potentially impact upon the process to a serious and adverse degree").

**53.** This case was styled *Southern Ute Indian Tribe v. Amoco Prod. Co. et al.*, case number 91-B-2273, United States District Court for the District of Colorado.

**54.** Ex. S947 at 14818 (emphasis added).

**55.** Ex. S885 at 13354.

**56.** Ex. S885 at 13355.

the Martinez family against four private energy companies, Red Willow, and the Tribe.[57] He asserted two claims for relief, alleging that the defendants had fraudulently underpaid royalties and that the defendants' actions constituted deceptive trade practices resulting in underpayment to Martinez.[58] In the complaint, Respondent stated: "Defendants Tribe and Red Willow are Colorado entities, but also enjoy some level of sovereignty."[59] He did not, however, further address the Tribe's sovereign immunity from suit or any express waiver of such immunity.

On July 7, 2014, after receiving the complaint, Shipps called Respondent and sent him a letter, notifying him that the Tribe and Red Willow had tribal sovereign immunity from suit.[60] In that letter, Shipps explained that absent an express waiver, the Tribe is immune from suit.[61] Shipps also cited numerous legal authorities supporting his position, including U.S. Supreme Court cases and Colorado case law.[62] He thus asked Respondent to drop the Tribe and Red Willow from the case.[63] Shipps told Respondent that if he did not do so, Shipps would file a motion to dismiss on sovereign immunity grounds and that, on dismissal, the court would be obligated to award attorney's fees under C.R.S. section 13-17-201.[64] According to Shipps, he wanted Respondent—and Respondent's clients—to be aware of the risks of going forward with the case.

Respondent replied the same day, asking for additional time to review the cited cases.[65] He also informed Shipps that he had not found any case that would allow the Tribe to stand behind its immunity when it maintained an interest in a lease between two non-Indian entities.[66] Shipps, for his part, testified that Respondent never indicated that he had any evidence that the Tribe had waived its sovereign immunity.

Shipps wrote Respondent a second letter on July 10, 2014, informing him that an Indian tribe cannot be sued without proper consent from the Tribe.[67] He pointed Respondent to Cash Advance and Preferred Cash Loans v. Colorado, a case in which the Colorado Supreme Court held that a congressional abrogation or tribal waiver of sovereign immunity "cannot be implied but must be unequivocally expressed."[68] Shipps also told Respondent that a recent U.S. Supreme Court case held that regardless of the location or nature of the activity of the tribe at issue, the doctrine of tribal sovereign immunity applied.[69] Shipps reiterated that an award of attorney's fees would be mandatory if Respondent did not dismiss the case.[70]

In a letter dated July 10, 2015, Respondent informed Shipps that he had reviewed Shipps's cited cases and did not agree with his position.[71] He also asked Shipps for any evidence of Congressional acts which "might have modified things as to the Tribe" or any authority "which modifies things due to it being oil and gas, spacing units or the like . . . ."[72] The next day, Respondent again wrote Shipps, telling him that he had "read way too many cases on Tribal Sovereign Immunity, almost all of which are yellow-flagged—which does not help and only adds

57. Ex. S885 at 13353-62.

58. Ex. S885 at 13355-61.

59. Ex. S885 at 13355.

60. Ex. S1007.

61. Ex. S1007.

62. Ex. S1007.

63. Ex. S1007.

64. Ex. S1007.

65. Ex. II at 0572.

66. Ex. II at 0572.

67. Ex. S1008.

68. Ex. S1008 at 0576 (citing Cash Advance & Preferred Cash Loans v. Colo., 242 P.3d 1099, 1107 (Colo. 2010)).

69. Ex. S1008 at 0576 (citing Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754-55, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998)).

70. Ex. S1008 at 0577.

71. Ex. II at 0574.

72. Ex. II at 0574.

to the confusion."[73] Also in this letter, Respondent asked Shipps to disclose anything "within Tribal Records which would shed light on whether the Tribe [h]as waived its immunity for a matter such as this," and then suggested "[a]s an alternative, if the Tribe would waive its immunity for this case, I would move to transfer the case to Denver County. Alternatively, if the Tribe would waive its Immunity for this case, I would dismiss it (and Red Willow, whom I believe should be dismissed in any event) and re-file in Tribal Court."[74] Respondent sent Shipps a third letter on July 12, reporting that he now believed the Tribe had expressly waived its immunity by way of the Martinez oil and gas lease or in the assignment of the lease.[75]

Seven days later, Respondent moved to dismiss Red Willow but not the Tribe.[76] Shipps testified here that by this point Respondent had no good faith basis to keep the Tribe in the case, because he had no evidence of the Tribe's express waiver of immunity, as required by clear, binding legal precedent.

On July 21, 2014, the Tribe moved to dismiss for lack of subject matter jurisdiction, claiming it had not waived sovereign immunity as to Respondent's clients' claims.[77] Respondent opposed this motion, arguing that the *Cash Advance* case was distinguishable, and that the Tribe "explicitly and unequivocally waived its immunity."[78] He also claimed that the Tribe impliedly consented to the plaintiffs' case when it leased its mineral rights to a nontribal entity, when that entity entered into agreements with nontribal operators to develop tribal and nontribal minerals, and when the Tribe acquired an interest

in his clients' lease.[79] Finally, he argued that his clients' case presented an issue of first impression: whether the Tribe could hide behind sovereign immunity to avoid liability for underpayment of revenue, noting that neither he nor Shipps could provide a case addressing that question.[80] Respondent acknowledged, however, that he had the burden to prove the Tribe's waiver.[81]

In reply, the Tribe again cited binding Colorado case law, which provided that only Congress or the Tribe can waive the Tribe's sovereign immunity from suit. The Tribe averred that Respondent had not produced any evidence of an express waiver, instead simply speculating that a waiver must exist somewhere in CBM case documents.[82] The Tribe asserted that it did not waive its sovereign immunity from suit in the lease with Martinez or in any other relevant agreements.[83] Finally, the Tribe contended that Respondent misread the relevant case law about the scope of tribal sovereignty and tribal sovereign immunity.[84]

On September 30, 2014, Judge Jeffrey R. Wilson ruled that Respondent had not met his burden of controverting the Tribe's sovereign immunity, but he granted Respondent additional time to obtain any CBM-related documents from the federal courts that might demonstrate a waiver of such immunity.[85]

On October 25, 2014, Respondent moved to reconsider the court's ruling and to request additional discovery to rebut the exhibits the

---

73. Ex. *II* at 0579.

74. Ex. *II* at 0579-80.

75. Ex. *II* at 0582-53.

76. Ex. S890 (indicating that because Red Willow "is literally the Tribe 'doing-business-as[,'] it [was] unnecessary for Red Willow to be a party in these proceedings").

77. Ex. S895 at 13451-76. Each of the three defendants in this case filed a motion to dismiss. *See Ex. S950 at 14835.*

78. Ex. S895 at 13724.

79. Ex. S904 at 13724.

80. Ex. S904 at 13725.

81. Ex. S904 at 13724.

82. Ex. S930 at 14494-506.

83. Ex. S930 at 14496-98.

84. Ex. S930 at 14500-51.

85. Ex. *S941. The court also noted that Respondent misconstrued two cases he was relying on for the proposition that a state can exercise juris-*

Tribe had attached to its motion to dismiss.[86] After obtaining additional public records, he then supplemented his response on November 11, 2014, arguing that the Tribe had waived its immunity in its CBM settlement agreement with Amoco, and that his clients were third-party beneficiaries of that waiver.[87] The Tribe responded, agreeing that it had expressly waived its sovereign immunity as to its specific agreements with Amoco in the CBM case, but noting that those agreements did not include Respondent's clients or their claims.[88]

On January 12, 2015, the court dismissed the case against the Tribe.[89] In a clarification issued on March 27, 2015, the court stated that it had done so because it lacked subject matter jurisdiction over the Tribe, which was immune from suit due to its sovereign status and that the Tribe's waiver of immunity in the CBM settlement and partnership agreements was limited to disputes between those relevant parties.[90]

The Tribe moved for sanctions under C.R.S. section 13-17-101, arguing that Respondent knew or should have known his clients' claims were barred by the Tribe's sovereign immunity, and thus his clients' claims were frivolous and groundless.[91] Respondent filed four documents in response: a response, a request for discovery concerning the motion for fees, a motion for an evidentiary hearing, and a motion for partial summary judgment and dismissal of portions of the Tribe's motions for fees under C.R.C.P. 56.[92] In the partial summary judgment motion, Respondent admitted that he had not consulted with his clients about the Tribe's assertion of tribal immunity and the risk that

the Tribe would seek attorney's fees should it prevail.[93]

On April 27, 2015, the court granted the Tribe's motion for attorney's fees without holding an evidentiary hearing.[94] In that order, the court found that Respondent knew of the Tribe's sovereign immunity from the start of the case; that, "without credible evidence or rational argument, [he] pursued the[ ] contention that the Tribe had waived its immunity to Plaintiffs' claims"; and that "Plaintiffs' arguments in this case that the Tribe had waived its immunity were disrespectful of truth and accuracy and were supported by neither credible evidence nor rational argument."[95] The court awarded $34,683.71 in fees and costs against Respondent and his clients, jointly and severally.[96] Respondent later discharged his fee obligation in bankruptcy.

Respondent testified that he spent hours researching the law of tribal immunity during the Martinez litigation. He understood, he stated, that a Tribe can only be sued if immunity is abrogated by Congress or expressly waived by the Tribe. But he opined that *C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma* [97] eroded the concept of an express waiver, allowing a tribe to impliedly waive immunity from suit. He stated that he believed the Tribe had impliedly waived its sovereign immunity as to the Martinezes' claims when it entered into the CBM settlement agreement. He testified that he brought the Martinez case in good faith, advanced logical arguments, and made an effort to extend and modify existing law governing express waivers of tribal sovereign immunity.

---

diction over a federally recognized Indian tribe. Ex. S941 at 14598.

86. Ex. S944.

87. Ex. S946 at 14626-36.

88. Ex. S947 at 14813-24.

89. Ex. S950. In that order, the court ruled that the plaintiffs' claims were barred by the statute of limitations and the settlement agreement in the Parry case, which will be discussed in further detail below. *See* Ex. S950 at 14838-39.

90. Ex. S972.

91. Ex. S956.

92. Exs. S973, S975-977.

93. Ex. S973 at 15086.

94. Ex. S980.

95. Ex. S980 at 15172-73.

96. Ex. S980 at 15173.

97. 532 U.S. 411, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001).

Shipps proffered an expert opinion that Respondent neither acted competently nor had a good faith basis to file or pursue the case. According to Shipps, a competent lawyer—particularly one who practiced law in Durango, where the Tribe has a notable presence—would never have filed this case without first researching applicability of tribal sovereign immunity. Shipps also opined that Respondent had no good faith basis to advance his argument that the Tribe had waived its sovereign immunity, because he was unable to produce any evidence of waiver. Respondent essentially was guessing that the Tribe had done so, Shipps said. Further, he testified, the Tribe expressly waived sovereign immunity only as to Amoco and BP in the CBM settlement agreement, not as to any third parties. Respondent had a "confused reading" of the controlling law, Shipps said, and he did not understand the concept of immunity from suit. Shipps also testified that Respondent improperly moved for partial summary judgment in response to the Tribe's motion for attorney's fees: a summary judgment motion was not applicable in such a stage of proceedings, since the case had already been dismissed.

Ledbetter, on the other hand, opined that although Respondent could not prove that the Tribe had waived its sovereign immunity, he advanced a legal theory based on a line of cases demonstrating erosion in that area of law. Just because the courts did not agree with Respondent's position, averred Ledbetter, does not mean that Respondent was incompetent or filed a frivolous suit.

### Colo. RPC 1.1

The People argue that Respondent violated Colo. RPC 1.1 in this matter by naming the Tribe as a defendant, despite the Tribe's sovereign immunity. Respondent's suit against the Tribe, contend the People, was an outgrowth of his inadequate research and his failure to analyze the law of tribal sovereign immunity.

For his part, Respondent stands by the arguments he made in the underlying case: that the Tribe should not have been permitted to hide behind immunity when it was assigned a share of an oil and gas lease between two nontribal entities; that the Tribe expressly waived its sovereign immunity when it received an interest in the Martinez oil and gas lease from a nontribal entity; and that the Tribe impliedly waived its immunity from suit when it entered into the CBM settlement agreement.

We conclude that the People have proved by clear and convincing evidence Respondent's incompetence in this matter. Respondent agreed to represent the Martinez family having no prior Indian law experience, yet he did not confer with an experienced practitioner in this area of law before filing suit against the Tribe.[98] Had he done so, he might have realized that the Tribe enjoys sovereign immunity from suit, and that he had the burden to disprove its immunity by demonstrating, for example, the Tribe's express waiver of such immunity.[99] Yet in his complaint, he made no mention of the Tribe's sovereign immunity. Nor did he make any factual allegations about waiver of sovereign immunity. The absence of any such allegation demonstrates to us that, at the time Respondent filed the complaint, he failed to understand relevant legal principles, he did not appreciate the legal obstacles that he would need to overcome to advance his clients' claims, and he lacked evidence of any tribal waiver. In fact, the evidence convincingly shows that Respondent did not even become aware of relevant case law governing tribal sovereign immunity until he received Shipps's first letter, to which he responded that he would like more time to review the cases Shipps cited. Though Respondent was duty-bound to learn well-settled principles of law applicable to his clients' case before filing their complaint, he failed to do so.[100]

---

98. *See* Colo. RPC 1.1 cmt. 1.

99. *Cash Advance*, 242 P.3d at 1107.

100. *See People v. Boyle*, 942 P.2d 1199, 1201 (Colo. 1997) (finding that a lawyer failed to adequately prepare for a hearing); *People ex rel.*

*Goldberg v. Gordon*, 199 Colo. 296, 607 P.2d 995, 997 (1980) (finding that a lawyer who used a probate proceeding to transfer joint-tenancy assets demonstrated a "total lack of understanding of fundamental principles essential to the practice of law."); *Fla. Bar v. Lecznar*, 690 So.2d

We also conclude that after receiving Shipps's letters, Respondent knew or should have known that he could not continue his suit against the Tribe. Shipps pointed Respondent to controlling case law that made clear the Tribe was immune from suit, save for an express tribal waiver or a congressional abrogation of sovereign immunity. Rather than furnishing proof of a waiver, Respondent sought information that "would shed light on whether the Tribe has waived its immunity" for his clients' claims or, in the alternative, asked the Tribe to waive its immunity in exchange for refiling the case in Denver County or tribal court. These requests—essentially fishing expeditions—reflect a lack of thoroughness and preparation on Respondent's part.

■ Perhaps realizing that the Tribe would decline to provide proof of a waiver, Respondent crafted an argument that the Tribe had expressly waived its immunity in the Martinez oil and gas lease and when it received an assignment of its interest. When the district court rejected those claims, Respondent scrambled, changing tack and advancing a vague, speculative argument that the Tribe impliedly waived its sovereign immunity. He did so despite lacking supporting evidence and case law. His attempts to distinguish his clients' case from controlling law were not well developed, articulated, organized, or capable of being understood—either by the district court, by us, or, initially, his own expert.[101] And though the court gave him additional time to produce evidence of the Tribe's alleged waiver, he did not do so.

As a lawyer, Respondent is expected not only to analyze relevant rules and principles and to apply them to the facts of his clients' case, but also to articulate new theories and arguments in a cogent and persuasive way. He failed to do so here.[102]

■ Finally, lawyers are required to know and follow all applicable rules of procedure.[103] We conclude that Respondent acted incompetently when he responded to the Tribe's motion for attorney's fees by moving for partial summary judgment on that request. This procedural misstep reflects a general misunderstanding of civil procedure because the case had already been dismissed. Accordingly, we find that Respondent violated Colo. RPC 1.1.

## Colo. RPC 1.4(a) and (b)

■ We also determine that Respondent violated Colo. RPC 1.4(a), which requires a lawyer to promptly inform the client of any decision or circumstance requiring the client's informed consent, and Colo. RPC 1.4(b), which requires a lawyer to explain a matter to the extent reasonably necessary to permit the client to make informed decisions. Respondent admitted that he transgressed these rules by failing to advise his clients about the risks of proceeding against the Tribe, and about the possibility that they might be required to pay the Tribe's attorney's fees and costs.

## Colo. RPC 3.1

■ Next, we find that the People have proved Respondent's violation of Colo. RPC

1284, 1285 (Fla. 1997) (finding that a lawyer's failure to name an insurance company as a defendant in a personal injury lawsuit within the applicable statutory time limit evinced a failure to understand relevant legal doctrines or procedures).

101. Ledbetter testified that initially he was skeptical of Respondent's arguments, as they concerned narrow areas of law, but once he saw how exhaustively Respondent had researched his position, Ledbetter began to think that the arguments were correct. He predicted that the courts would not understand Respondent's arguments because he was "ahead" of his time, but Ledbetter opined that as the oil and gas industry develops, Respondent's arguments will prevail.

102. See *Lieber v. Hartford Ins. Ctr.*, 15 P.3d 1030, 1037-38 (Utah 2000) (finding that a lawyer failed to apply the black letter law where his brief relied on an overruled case and misrepresented distinguishable case law as the general rule; the lawyer also maintained that a case had no value as precedent if it was not recently cited); *Lawyer Disciplinary Bd. v. Turgeon*, 210 W.Va. 181, 557 S.E.2d 235, 238 (2000) (finding a lawyer incompetent when he did not understand how the federal sentencing guidelines applied to his client's case).

103. See *Ryan v. Ryan*, 260 Mich.App. 315, 677 N.W.2d 899, 909 (2004) (filing a complaint without the required verification or supporting affidavits "calls into question the competence and good faith of the plaintiff's attorney").

3.1 by clear and convincing evidence. The People assert that Respondent contravened this rule when he filed a frivolous complaint, defended proceedings that had no basis in law or fact, and failed to put forth any good faith argument for extension, modification, or reversal of existing law. Respondent asserts that his decision to file against the Tribe was not frivolous, relying on the arguments he made in response to the Tribe's motion to dismiss.

 As already discussed, we must use an objective standard to determine whether Respondent's suit was frivolous.[104] The filing of an action is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence through discovery, but the lawyer must be informed about the client's case and the applicable law, and the lawyer must determine whether a good faith argument can be made in support of the client's positions before bringing suit.[105] Once it becomes apparent that a claim lacks merit, an attorney violates Colo. RPC 3.1 by continuing to advance the claim, rather than withdrawing it.[106]

We conclude that Respondent failed to reasonably investigate whether he could sue the Tribe—including by researching the law of tribal sovereign immunity—before filing suit against the Tribe. As a result, he filed a frivolous complaint. Had Respondent informed himself of the governing law, he would have known that he could not sue the Tribe absent an express tribal waiver or a Congressional abrogation. As it stands, Respondent's complaint was devoid of any factual allegations of sovereign immunity from suit, express waiver, or abrogation; this absence suggests not that Respondent believed it was likely that he could develop evidentia-ry support for his claims after further investigation or discovery, but rather that he did not even know of his burden to show waiver of immunity.[107] Indeed, as discussed above, we find it highly likely that Respondent first became aware of the applicable law only when he received Shipps's July 2014 letters.

After receiving Shipps's letters, Respondent attempted to cobble together an argument that the Tribe expressly waived immunity. Yet he lacked facts to advance this argument, as demonstrated by his rather shocking request that Shipps simply hand over any information that would prove tribal waiver. Respondent even asked whether the Tribe would waive its immunity in exchange for refiling the suit in tribal court, an implicit acknowledgment that he lacked even a modicum of factual support for waiver. In our estimation, Respondent at this point was grasping for any evidence to support his claims because he had not adequately investigated the validity of his allegations. Then, after the district court rejected his arguments that the Tribe had expressly waived immunity via the Martinez oil and gas lease or by assigning that lease to the Tribe, Respondent pieced together an implied waiver argument. But that argument was premised neither on facts at hand nor on a cogent legal argument for broadening established federal law to encompass implied waiver theories. The law in this area is clear and has been for a long time. We are not persuaded by Respondent's analysis of *C&L Enterprises*, as that case stands for the proposition that a tribe can expressly waive its sovereign immunity from suit through an arbitration clause in a contract.[108] Respondent knew or should have known that he had no evidence or legal mooring to support an implied waiver argument, and he should have dismissed his complaint against the Tribe.[109]

---

**104.** *In re Olsen*, 326 P.3d at 1009.

**105.** Colo. RPC 3.1 cmt. 2.

**106.** *O'Brien v. Superior Court*, 105 Conn.App. 774, 939 A.2d 1223, 1232 (2008); *see* Hazard at § 27.12 (3d ed. Supp. 2007) (even under an objective standard, "some element of subjectivity remains," but discipline "should be imposed only if the lawyer *persists* in the error, or it is an error [not arising from] a single or simple mistake").

**107.** *See* C.R.C.P. 11(a).

**108.** 532 U.S. at 1597, 121 S.Ct. 1589 (finding that the Indian tribe expressly waived its sovereign immunity by consenting to the terms of an arbitration agreement).

**109.** *See In re Egbune*, 971 P.2d at 1069 (finding that a reckless state of mind is equivalent to knowing for disciplinary purposes).

Accordingly, we find that not only was Respondent's strategy in this case flawed, he also had no viable legal or factual support for filing the complaint or for continuing to retain the Tribe as a defendant, given the current state of tribal immunity law.[110]

### Colo. RPC 8.4(d)

 We do not find, however, that the People have demonstrated a violation of Colo. RPC 8.4(d) by clear and convincing evidence. Although Judge Wilson testified that he spent more time on the Martinez case than his other cases, he was not called upon to—and thus did not—elucidate what concrete harm to the administration of justice Respondent's conduct occasioned. Nor do we find reason to believe that Respondent's handling of the case affected Judge Wilson's workload to a serious degree.[111]

### The Keith, Watson, and Cugnini Matters

The People also charge Respondent with committing misconduct while he represented the Keith Family Limited Partnership ("the Keith Family"), the Rose L. Watson Revocable Trust ("the Watson Trust"), and Patrick Cugnini ("Cugnini") in three separate cases and appeals as to these parties' leases of mineral rights to oil and gas production companies. Because these three cases transpired around the same timeframe and featured nearly identical legal and factual issues, we address them together, largely in chronological order. To place these cases in context, we begin by briefly discussing the relevant law

governing oil and gas leases in Colorado. We follow with the Parry and Cugnini settlement agreements, which play integral roles in these three cases. Then, we discuss the relevant pleadings, orders, arguments, and rulings in the district and appellate courts. We conclude by analyzing the alleged rule violations.

### Relevant Oil and Gas Law

 Colorado courts recognize four implied covenants consistent with the expectations of parties to an oil and gas lease: to conduct exploratory drilling, to develop after discovering resources that can be profitably developed, to operate diligently and prudently, and to protect the leased premises against drainage.[112] Underlying all implied covenants is the prudent operator standard.[113] This standard requires a lessee to conduct itself as a reasonable and prudent operator would under the circumstances.[114] This standard effectuates the purpose of an oil and gas lease: to make mineral estates profitable through exploration, development, and the production of resources under the surface of leased premises.[115]

 As relevant in this disciplinary case, the covenant to conduct exploratory drilling encompasses the reasonable and prudent operator standard, as measured by standards of the oil and gas industry.[116] This covenant "includes both exploration before discovering an initial reservoir and later exploration for

---

**110.** *See Michigan v. Bay Mills Indian Cmty.,* ── U.S. ──, 134 S.Ct. 2024, 2027, 188 L.Ed.2d 1071 (U.S. 2014); *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.,* 523 U.S. 751, 756, 118 S.Ct. 1700, 140 L.Ed.2d 981 (U.S. 1998); *Cash Advance,* 242 P.3d at 1107.

**111.** *See In re Mason,* 736 A.2d at 1023.

**112.** *Whitham Farms, LLC v. City of Longmont,* 97 P.3d 135, 137 (Colo. App. 2003).

**113.** *Id.* at 137-38; *N. York Land Assocs. v. Byron Oil Indus., Inc.,* 695 P.2d 1188, 1190-91 (Colo. App. 1984) (indicating that whether a lessee has complied with its obligations to explore or to develop is measured by the prudent operator standard and noting that this standard includes any obligation to develop reasonably or to explore further).

**114.** *See Gillette v. Pepper Tank Co.,* 694 P.2d 369, 372 (Colo. App. 1984) ("the work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor.... [r]easonable diligence is, 'whatever, in the circumstances, would be reasonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee.' ") (quotation omitted); *see also* 1B Philip D. Barber, Colo. Practice, Methods of Practice § 13:6 (6th ed. 2016).

**115.** *Whitham Farms,* 97 P.3d at 137.

**116.** *Id.* at 137-38.

additional reservoirs in unproven areas." [117] Once a lease has been adequately explored, a lessee is required to develop further only when it can be established that the additional development would be profitable to both the lessee and lessor.[118]

Whether a lessee has developed the leasehold as a prudent operator rests upon several factual considerations, including geological data, the number and location of drilled wells on the leasehold estate and adjoining property, the productive capacity of the producing well, the cost of drilling operations, the time elapsed between the completion of the last well and the demand for additional operations, and the acreage involved.[119] In other words, a "lessee is required to further develop the lease when there is a reasonable expectation that one or more new wells would generate enough revenue to cover the cost of development and return a reasonable profit." [120]

To decide whether there has been a breach of the implied covenant to reasonably develop the leasehold, a court must determine whether a reservoir of oil and gas has been found and, if so, whether that reservoir could be developed profitably.[121] Thus, when a prudent operator has a "reasonable expectation of such economic viability and a lessee is not developing the field, it is proper to conclude that the lessee breached the covenant of reasonable development and to grant an equitable termination to the lessor." [122] The burden of proof rests

upon the lessor to establish that the lessee has breached an implied covenant.[123]

### The Parry & Cugnini Settlements

*Parry v. Amoco Production Co., n/k/a BP American Production Co.,* Case number 94CV111, consolidated with 94CV105, in La Plata County District Court, was an oil and gas class action filed in 1994.[124] The plaintiff class members consisted of approximately 5,000 to 6,000 royalty and overriding royalty owners with interests in oil and gas leases covering lands in La Plata and Archuleta County.[125] The class sought the reimbursement of post-production cost deductions from Amoco (hereinafter referred to as "BP").[126] Thomas P. Dugan was one of the lawyers who represented BP, and G. Robert Miller was one of the lawyers who represented the plaintiff class members. Respondent was not involved in this litigation. Judge David L. Dickinson presided over this case.

In July 1996, the Parry case was certified as a class action under C.R.C.P. 23(a) and (b),[127] and the first amended complaint asserted eight claims for relief.[128] As relevant to this disciplinary matter, the fourth claim for relief alleged that BP had breached the implied covenant of absolute good faith and to act as a prudent operator.[129] And the seventh claim for relief alleged that BP had a duty to "operate the applicable leases and to calculate, account for and pay royalty to the Members of the Plaintiff Class in absolute good faith resulting from covenants implied in each Amoco Instrument." [130]

117. *Id.* at 137 (citing *Gillette,* 694 P.2d at 369).

118. *Whitham Farms,* 97 P.3d at 137.

119. 1B Colo. Prac., Methods of Practice § 13:6.

120. *Id.*

121. *Whitham Farms,* 97 P.3d at 138. In all three of Respondent's clients' cases, it was undisputed that a reservoir of oil and gas had been found.

122. *Id.*

123. *Id.* (finding that with regard to implied covenants in oil and gas leases, the "general rule is that the lessor has the burden of proof to show that the lessee did not act in good faith and as a reasonably prudent, similarly situated busi-

nessm[a]n" and declining to adopt a burden-shifting approach urged by the plaintiff) (quotation omitted); *see also Gillette,* 694 P.2d at 372.

124. Ex. S594 at 08666-85 (first amended complaint).

125. *See* Ex. S594 at 08666-85.

126. *See* Ex. S594 at 08666-85.

127. Ex. S594 at 08686-98 (class certification).

128. Ex. S594 at 08666-85.

129. Ex. S594 at 08672-73.

130. Ex. S594 at 08680.

In 2005, the parties filed a proposed settlement agreement.[131] A notice of the proposed settlement was served on each member of the plaintiff class.[132] The notice warned class members that acceptance of the settlement funds would release the settled claims and would bind the class members and their successors and assigns.[133] The court then held a fairness hearing where members of the plaintiff class could present objections to the proposed settlement.[134] No member objected, and the Parry settlement agreement was approved by Judge Dickinson.[135]

The pertinent terms of the 2005 Parry settlement are as follows:

1.34. 'Released Parties' means Defendant, and all other working interest owners or other royalty or overriding obligors in wells situated on lands covered by the Leasehold Estates for whom or on whose behalf Defendant has paid Royalty to members of the Plaintiff Class and/or for whom or on whose behalf Defendant made or makes Settlement Payments to members of the Plaintiff Class on their behalf, including but not limited to ... as well as ... *successors and assigns of Defendant and all such other working interest owners or other royalty or overriding royalty obligors.*[136]

1.38. 'Settled Claims' means *any and all claims,* causes of action, demands, rights, and liabilities, of any kind or nature, and any and all claims of breaches of express provisions, *breaches of implied covenants,* breaches of statutory duties, *breaches of common law duties,* omissions, failures to act, conflicts of interest, tortious acts, intentional acts, negligent acts, grossly negli-

gent acts, acts of unjust enrichment, or any other duties or obligations or claims of damage, including claims for punitive damages, *which are based upon, or which could be based upon or arise from, any of the matters alleged on behalf of the Plaintiff Class in the First Amended Complaint* in the Action, including the following [sixty-three paragraphs]:

(i) ... (xxiv) failure to *operate the Leasehold Estates in good faith and as a prudent operator,* (xxv) failure to locate facilities used to gather, compress and treat natural gas produced from the Leasehold *Estates in good faith and as a prudent operator,* (xxvi) failure to calculate, account for and pay Royalty *in good faith and as a prudent operator,* (xxvii) the taking of opportunistic advantage of the Class by operating the Leasehold Estates or *making decisions in a manner which benefits Defendant and harms the Class* ... *(xxx) failure to act as a reasonable and prudent operator....*[137]

...

12.5 This Agreement may be amended or modified only by a written instrument signed by or on behalf of all the Settling Parties or their successors in interest.[138]

...

12.7 This Agreement and Exhibits hereto constitute the entire agreement among the Settling Parties.[139]

As pertinent to this disciplinary proceeding, plaintiff class member Charles N. Keith received $64,430.09 [140] and plaintiff class member Rose L. Watson received $20,047.02 in exchange for releasing the settled

**131.** Ex. S594 at 08699-745 (Parry stipulation and settlement agreement).

**132.** Ex. S594 at 08735-45 (Parry notice of proposed settlement of class action, which included a summary of the terms of the settlement and a reference to paragraph 1.38 of the settlement agreement). There was no dispute that the class members relevant to this disciplinary case received this notice.

**133.** Ex. S594 at 08741-42.

**134.** Ex. S594 at 08746-960 (transcript of the fairness hearing).

**135.** Ex. S594 at 08961-67 (Parry judgment).

**136.** Ex. S594 at 08713 (emphasis added).

**137.** Ex. S594 at 08713-15 (listing 63 subparagraphs of settled claims) (emphasis added).

**138.** Ex. S594 at 08730.

**139.** Ex. S594 at 08730. Dugan testified that all the parties understood that the settlement was a fully integrated document covering all the essential terms of the parties' agreement.

**140.** *See* Ex. S331 at 04074 & 04076; Ex. S402 at 05599.

claims.[141] Cugnini Land & Cattle Company ("Cugnini Land") opted out of the plaintiff class and did not participate in the Parry settlement process.

The Hearing Board received testimony offering two different interpretations of the settled claims clause. Dugan stated that section 1.38 was a broad release of claims against BP and that the following sixty-three subparagraphs contained limiting language releasing more specific claims against BP. According to Dugan, the plain language of these provisions unambiguously released any claim asserted against BP arising from breach of implied covenants (including the implied duty of good faith and fair dealing and to act as a prudent operator), which either arose from the first amended complaint in Parry or could have been brought in that complaint.[142] In support, Dugan pointed to specific language in section 1.38 and preceding paragraphs specifically referencing claims for failing to act as a prudent operator, failing to operate the lease in a good faith manner, operating the lease favorably to BP, and breaching any of the four implied covenants.[143]

As Dugan testified, the parties to this agreement understood that once a released party—which included successors and assigns—accepted financial payment from BP, that party was enjoined from prosecuting any of the settled claims against BP.[144] Dugan also testified that the Parry settlement agreement was negotiated and mutually agreed on by the parties and was one of the most scrutinized and thoroughly reviewed documents in his legal career. Further, Dugan maintained that a reasonable lawyer most certainly would have reviewed the terms of the Parry settlement and Judge Dickinson's final judgment before bringing an action against BP on behalf of a settled class member.

Miller interpreted the settled claims provision in Parry more narrowly than Dugan. According to Miller, during the Parry settlement negotiations BP initially proposed a broad release of claims to include any conceivable claim against BP, which Miller viewed as an expansion of the claims pleaded in the first amended complaint. Miller was concerned that this broad release would require the plaintiff class to again amend the complaint and recertify the class claims under C.R.C.P. 23. Thus, after some negotiation, Miller stated, the parties agreed to the current language in the settlement agreement. Miller agreed that section 1.38 was a broad release of claims but, contrary to Dugan, he opined that the sixty-three following subparagraphs specifically released only those claims against BP that were factually pleaded in the first amended complaint, e.g., arising from post-production cost deductions and the underpayment of royalties. If the releases were interpreted any more broadly, Miller stated, the plaintiff class members would have been deprived of due process. Thus, according to Miller, for a claim against BP to have been released, the language of the limitation needed to be satisfied, and any claims exceeding that language could go forward in litigation.

In 2007, Respondent represented Cugnini Land, which had opted out of the Parry class action. Cugnini Land hired Respondent to negotiate a settlement with BP based on the Parry settlement agreement.[145] The settlement agreement that Respondent negotiated

141. *See* Ex. S1004 at 0360.

142. *See* Ex. S594 at 08713-15.

143. *See* Ex. S594 at 08713 & 08714 ¶¶ XXIV (failing to operate the leasehold estates in good faith as a prudent operator), XXVII (taking opportunist advantage of the class by operating the leasehold estates), and XXX (failing to act as a reasonable and prudent operator).

144. *See also* Ex. S594 at 08741-42 (notice to class members of settlement, including the following provision: "In exchange for its payment of the sums identified above and its commitment not to apply the Deductions in question in the future, Amoco and other working interest owners or other royalty and overriding royalty obligors for which Amoco has paid royalties and overriding royalties and on whose behalf Amoco shall make refunds as provided above, will be released from all 'Settled Claims,' which means....").

145. *See* Ex. S780 at 11893 & 11913.

and approved for Cugnini Land specifically incorporated the Parry settlement agreement.[146] The agreement also included the Parry settlement definitions of "Settled Claims" and "Released Parties" and it provided that "Cugnini [Land] has copies of and is familiar with the Stipulation and Settlement Agreement and Judgment entered in the [Parry] Action[.]"[147] The agreement further barred "any and all actions which . . . [the parties or their successors] might or could sustain by reason of any of the matters included in this Settlement Agreement and Release."[148] After the parties reached an agreement,[149] Cugnini Land received $46,468.15 from BP in exchange for the settlement and release of claims.[150]

Respondent admitted before the Hearing Board that he had not asked for a copy of or read the terms of the Parry settlement in 2007 before he negotiated the settlement between BP and Cugnini Land, even though Cugnini Land's settlement expressly incorporated terms from the Parry settlement agreement. Respondent also did not review the notice sent to the class members or Judge Dickinson's final judgment approving the settlement, nor did he discuss with Miller his interpretation of Parry's settled claims before negotiating Cugnini Land's agreement. Respondent testified that he did not read the settlement agreement because he assumed that the settled claims were limited to BP's wrongful deduction of post-production costs and underpayment of royalties.

## The Keith, Watson, and Cugnini Complaints and Appeals

Charles N. Keith held mineral interests in the San Juan Basin in La Plata County.[151] In 1973, Keith entered into an oil and gas lease with a predecessor of BP.[152] In the mid-1970s, producers in the San Juan Basin began to extract gas from what is known as the Fruitland Coal Formation.[153] In 1988, four wells were drilled in Section 29 and began producing gas.[154] No further development of Section 29 had taken place thereafter.[155] In March 2009, Keith conveyed his mineral interest to the Keith Family.[156]

The Rose L. Watson Revocable Trust, too, owned real property and associated mineral rights in La Plata County.[157] This real property straddled lands covered by three General Field Orders entered by COGCC: the Dakota Morrison Formation, the Fruitland Coal Formation, and the Mesaverde Formation.[158] In November 1987, the Trust's predecessors, Harold and Rose Watson, entered into an oil and gas lease with Amoco Production Company, a predecessor of BP.[159] Amoco did not drill a well on the leasehold for quite some time.[160] In 2001, Ms. Watson and BP entered into surface use and side-letter agreements in connection with drilling a gas well on the leasehold.[161] In February 2002, Ms. Watson transferred her surface and mineral interests to the Watson Trust.

Edward and Viola Lipscomb and George Hams entered into an oil and gas lease with the Lama Corporation in 1979 for land in La Plata County known as Tract 1.[162] Cugnini Land acquired title to the surface and miner-

146. Ex. S780 at 11913 (indicating that his clients wanted to accept the terms and conditions of the Parry settlement).

147. Ex. S780 at 11893, 11918-19.

148. Ex. S780 at 11928 ¶ 2.

149. See Ex. S780 at 11923-31 (signed settlement agreement).

150. Ex. S780 at 11893 & 11918.

151. Ex. S242 at 01794. There is no dispute in these cases as to the underlying facts.

152. Ex. S242 at 01794.

153. Ex. S242 at 01795.

154. Ex. S242 at 01795.

155. Ex. S242 at 01795.

156. Ex. S242 at 01828-29 (warranty deed).

157. Ex. S513 at 06805.

158. Ex. S513 at 06806.

159. Ex. S513 at 06806.

160. Ex. S513 at 06805-07.

161. Ex. S513 at 06807.

162. Ex. S740 at 15408, 15410.

als beneath Tract 1 in 1980.[163] In 1994, Cugnini Land entered into an oil and gas lease with Amoco covering other real estate in La Plata County and associated mineral rights from 100 feet below the surface to the Dakota Morrison Formation, known as Tract 2.[164] In late 2007, Cugnini Land transferred its mineral rights in Tract 1 and 2 to Patrick Cugnini ("Cugnini").[165]

On February 8, 2010, Respondent filed suit against BP on behalf of the Keith Family ("the Keith case").[166] BP was represented by Dugan, and Judge Jeffrey R. Wilson presided over the case.[167] In the complaint, Respondent asserted, in part, that with the exception of four producing wells, BP had abandoned the Keith Family's oil and gas lease and breached the implied covenant of timely and reasonable development.[168] Respondent did not allege that such development would be profitable.[169]

Also on February 8, 2010, Respondent filed a complaint against BP on behalf of the Watson Trust ("the Watson case").[170] BP was represented by Dugan, and Judge David L. Dickinson—the same judge who presided over the Parry settlement—was assigned to the case.[171] In the complaint, Respondent alleged, in part, that BP had breached implied covenants of reasonable and timely development of the leasehold.[172]

Although predecessors of both the Keith Family and the Watson Trust had participated in the Parry settlement, Respondent testified that he did not read the Parry settlement agreement or the final judgment before filing complaints on behalf of those clients. Nor did Respondent consult with Miller—plaintiff class counsel in Parry—about the effect of the Parry settlement.

On March 31, 2010, BP filed three motions in the Keith case to dismiss various claims in Respondent's complaint.[173] As pertinent here, BP moved to dismiss Respondent's claim for breach of the implied covenant to develop, arguing that he had not identified any instance where BP failed to pursue economically viable prospects to develop the Keith Family lease.[174] On June 15, 2010, the district court dismissed all claims that Respondent lodged except for his allegation that BP did not reasonably develop the lease and failed to act as a prudent operator.[175] In that order, the court directed Respondent to file an amended complaint to include specific facts why BP had not reasonably developed the

**163.** Ex. S740 at 15411.

**164.** Ex. S740 at 15408, 15411.

**165.** Ex. S740 at 15413.

**166.** Ex. S242 at 01794-805. This case was styled *Keith Family Limited Partnership v. BP American Production Co.*, case number 2010CV54, La Plata County District Court.

**167.** Ex. S241 at 01763.

**168.** Ex. S242 at 01794-805. It is difficult to determine the claims Respondent made as he did not clearly label them.

**169.** Ex. S242 at 01794-805. Respondent advanced several claims in the Keith complaint and amended complaint. The People's complaint—and our analysis here—focuses on his claim that did survive the motion to dismiss: that BP breached the implied covenant of reasonable development and failed to act as a prudent operator.

**170.** Ex. S513 at 06805-16. This case was styled *Rose L. Watson Revocable Trust v. BP American Production Co.*, case number 2010CV55, La Plata County District Court. As in the Keith case, Respondent made several other claims in his complaint and amended complaint, but the only claim that survived BP's motions to dismiss was based on alleged breach of the implied covenant to reasonably develop the leasehold and failure to act as a prudent operator.

**171.** Ex. S518 at 06825.

**172.** Ex. S513 at 06807. Respondent filed a first amended complaint on April 14, 2010. Ex. S520 at 06835-42.

**173.** Ex. S249 at 01818-73 (motions to dismiss Parts 1 and 2 of Respondent's complaint); Ex. S250 at 01874-83 (motions to dismiss parts 3 and 4 of Respondent's complaint); Ex. S251 at 01884-93 (motion to dismiss part 5 of Respondent's complaint).

**174.** Ex. S249 at 01824.

**175.** Ex. S257 at 01963-67 (order dismissing complaint). The court also ordered Respondent to join the overriding royalty owners as defendants, which he did, but then he asserted no claim for relief against them in the amended complaint. *See* Ex. S262.

lease.[176] On June 29, 2010, Respondent moved to reconsider the court's order of dismissal.[177] In that motion, he asked the court to shift the burden to BP to prove profitability, despite case law to the contrary.[178] The court denied this motion on July 28, 2010, and gave Respondent an additional thirty days to file his amended complaint.[179] In the amended complaint, Respondent asked the court to take judicial notice of certain COGCC records and pointed to various other oil and gas developments in lands adjacent to or nearby his client's property to support his claim that BP had failed to act as a prudent operator.[180] Respondent's complaint was replete with lengthy narratives yet lacked specific facts showing that BP could generate enough revenue to cover the cost of development and return a reasonable profit.[181] Respondent also reasserted claims that had been previously dismissed by the district court in June.[182]

On May 17, 2010, BP moved to dismiss Respondent's claims in the Watson case.[183] BP argued, as it did in the Keith case, that Respondent had failed to specifically allege how its development would generate a reasonable profit and how it failed to act as a prudent operator.[184] On September 23, 2010, the court dismissed all of Respondent's claims except his claim that BP had breached the implied covenant to reasonably develop, ruling that whether further development of the leasehold would yield a reasonable profit was a question of fact.[185] On October 1, 2010, Respondent moved for reconsideration of the court's order and asked to join Ms. Watson as a plaintiff.[186] Thereafter, Respondent agreed to dismiss all claims except for the claim alleging breach of the implied covenant of reasonable development.[187]

On November 10, 2010, Respondent filed a complaint against BP on behalf of Patrick Cugnini ("the Cugnini case").[188] He testified that he did not read the Parry settlement agreement before filing this case. The matter was also assigned to Judge Wilson.[189] Respondent's complaint alleged that BP and its predecessors breached the implied covenant to reasonably develop the minerals under Tract 1 and Tract 2, in which his client owned interests.[190] He alleged that BP failed to develop formations other than the Fruitland Coal Formation and failed to drill "infill" wells to further tap the gas located in the Fruitland Coal Formation.[191] As in the Keith and Watson cases, Respondent did not specifically allege that BP could have profitably developed the Cugnini leasehold.[192]

176. Ex. S257.

177. Ex. S258 at 01968-76.

178. *Whitham Farms*, 97 P.3d at 139 (declining to adopt a burden-shifting approach). Ex. S258 at 01970-71. Respondent made similar arguments in his response to BP's motion to dismiss. *See* Ex. S252.

179. Ex. S260.

180. *See* Ex. S262 at 01997-02015.

181. *See* Ex. S262 at 01997-02015.

182. *Compare* Ex. S262 at ¶¶ 49-69, 02020 ¶ H *with* S257 (dismissing parts 2-4 of the complaint).

183. *See* Exs. S532 (motion to dismiss injury-to-water claim), S523 (motion to dismiss remaining claims), & S533 (reply in support of motion to dismiss remaining claims).

184. *See* Ex. S523 at 06853-06855.

185. Ex. S536.

186. Exs. S537 (motion for reconsideration) & S537 (petition to join additional party). Respondent argued that adding Ms. Watson would cure any deficiencies in his other claims that had been dismissed. These motions were denied on December 8, 2010. Ex. S541.

187. Ex. S542. This motion was granted. Ex. S543.

188. Ex. S740. This case was styled *Pat Duane Cugnini v. BP America Production Company*, case number 2010CV468, La Plata County District Court.

189. *See* Ex. S739.

190. *See* Ex. S740.

191. *See* Ex. S740 at 11552-53.

192. *See* Ex. S740. Respondent made several claims for relief in the complaint, but because only his claim that BP failed to act as a prudent operator by developing the leasehold survived BP's motion to dismiss, we focus just on this claim in our analysis.

On January 25, 2011, the Keith court reiterated that only one claim remained in the case and re-dismissed Respondent's duplicative claims.[193] The court also emphasized that "[w]hen read as a whole, the first amended complaint is incomprehensible," and ordered Respondent to file a second amended complaint.[194] Respondent did so on February 13, 2011.[195] In this second amended complaint, Respondent again alleged that BP failed to explore and develop other formations recognized by COGCC and failed to drill additional wells in the Fruitland Coal, Picture Cliffs, Mesaverde, and Dakota Formations to maximize production.[196] As ostensible proof, Respondent pointed to lands adjacent to his client's property, which contained producing wells.[197] He asserted that, based on the proven productivity of the adjacent sections, BP should have expected to produce oil and gas from his client's land and thus explored and tested these sections.[198] Dugan testified in the disciplinary proceeding that these types of general allegations are not typically enough to prove profitability before Colorado courts.

On March 25, 2011, Respondent filed a second amended complaint in the Watson case, again asserting that BP failed to timely and reasonably develop the lease and requesting that the lease be deemed abandoned.[199] As he did in the Keith case, Respondent supported his allegations by referring to other producing wells in the Fruitland Coal Formation.[200] In its answer, BP contended that developing the Fruitland Coal Formation was not required under the prudent operator standard and that the Watson Trust had resisted BP's efforts to further develop the leasehold by blocking access to the land.[201]

On May 6, 2011, the Cugnini court partially granted motions to dismiss filed by BP.[202] In those motions, BP had argued that Respondent failed to allege how additional development in the Fruitland Coal Formation and other formations would be commercially reasonable or prudent.[203] The court did not, however, dismiss Respondent's claim for breach of the implied covenant to develop the leasehold.[204]

On June 7, 2011, BP moved for summary judgment in the Keith case.[205] BP argued that it had acted as a prudent operator.[206] In support, BP detailed its drilling of four wells in the Fruitland Cliffs but admitted that it had not drilled wells in the deeper Pictured Cliffs, Mesaverde, and Dakota Formations.[207] BP also asserted that COGCC only permitted four wells to be drilled, which it had done, and averred that Respondent failed to identify specific development opportunities on the Keith lands that BP should have reasonably and profitably pursued.[208] As proof that it could not profitably develop those lands, BP included a 2004 study that demonstrated a thinning in the area of the Keith leasehold of the Picture Cliffs, Mesaverde, and Dakota Formations.[209] BP also submitted an affidavit from a retired petroleum

193. Ex. S276 at 02207.

194. Ex. S276 at 02208.

195. Ex. S277. Respondent sent his second amended complaint to Dugan to review before filing it. See Ex. S1002. Dugan told Respondent that he again failed to assert specific facts supporting his implied covenant to develop claim. See Ex. S1002.

196. Ex. S277 at 02210.

197. Ex. S277 at 02211-12.

198. Ex. S277 at 02212.

199. Ex. S544.

200. Ex. S544 at 06970-71.

201. Ex. S523 at 06975-81.

202. Ex. S752.

203. See Exs. 745 & 750.

204. Ex. S752.

205. Exs. S293 at 02358-02404. BP's initial motion for summary judgment and supporting brief are exhibits S291-292.

206. See Ex. S293.

207. Ex. S293 at 02359-60.

208. Ex. S293 at 02360.

209. Dugan explained here that when a formation experiences a thinning, there is less opportunity for profit.

engineer familiar with oil and gas operations in the relevant area, who opined that BP had acted as a prudent operator and that no facts justified any further exploration in this area.[210]

Respondent failed to respond to BP's motion for summary judgment in the Keith case. Instead, on July 5, 2011, he moved for additional discovery and to strike BP's motion for summary judgment, asking to depose BP's engineer under C.R.C.P. 26(b)(b)(A).[211] In support, he attached 1,500 pages of COGCC transcripts and orders, yet he included no citations to any relevant portions of those documents.[212] Nor did Respondent comply with C.R.C.P. 56(f), which required him to attach an affidavit stating his reasons why discovery was necessary.[213] Respondent testified at the hearing that he did not file an affidavit under C.R.C.P. 56(f) because he was unaware of this provision. Instead, he testified, he relied on his knowledge of Rule 56 from practicing law twenty years prior in Indiana. He also asserted that it was impossible for him to submit an affidavit in response to BP's summary judgment motion because he could not "prove the improvable"—in other words, only BP could show profitability by further drilling. Before the Hearing Board, Respondent said he relied on the fact that the Colorado Supreme Court had granted certiorari in *Whitham Farms* in 2004 to consider whether the Colorado Court of Appeals had erred in holding that the lessor bears the burden of proof to show breach of an implied covenant in an oil and gas lease.[214]

On June 27, 2011, BP moved for summary judgment in the Watson case and asked for an award of attorney's fees under C.R.S. section 13-17-102.[215] As it had in Keith, BP asserted that it was not required to develop the leasehold because it was not profitable given the thinning reserves in the Fruitland Coal Formation.[216] In support, BP submitted the affidavit from the petroleum engineer that it had submitted in Keith.[217] Like he did in the Keith case, Respondent did not respond to BP's motion for summary judgment, instead filing similar motions on July 24, 2011, to strike or to stay BP's summary judgment motion to allow him to conduct additional discovery under C.R.C.P. 26.[218] Once again, he did not submit a C.R.C.P. 56(f) affidavit or present any countervailing evidence in response to summary judgment. He attached the same 1,500 pages of COGCC transcripts, without any citations, for the court to review.[219]

On July 28, 2011, Respondent filed a first amended complaint in the Cugnini case, in which he added several parties and included claims that had been previously dismissed a few months before.[220] On October 25, 2011, the court dismissed all of Respondent's claims, except for his assertions that BP had not reasonably developed the lease, finding Respondent's allegations in that claim sufficient under Colorado's notice pleading juris-

---

210. *See* Ex. S294 at 02405-17. BP included exhibits with its engineer's affidavit, which contains averments about the price of gas and the costs of drilling, as well as a 2004 study that BP had performed concerning these formations. Dugan explained that this information is typically the type of specific data needed to prove profitability.

211. Exs. S301-02.

212. *See* Exs. S302 at 02499-03711 & S303.

213. *See* C.R.C.P. 56(f) ("Should it appear from the affidavits of a party opposing the motion that the opposing party cannot for reasons stated present by affidavit facts essential to justify its opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other orders as is just.").

214. *See Whitham Farms LLC v. Encana Energy Res., Inc.*, 2004 WL 2029371 (Colo. 2004) (summarizing the issues).

215. Exs. S552 & S553.

216. Ex. S553 at 07090-92.

217. *See* Ex. S553.

218. Exs. S556 (motion to strike) & S557 (motion for discovery).

219. See Ex. S556 at 07115-08181.

220. *See* Ex. S760 at 11635-36 (including claims for forced pooling that had been previously dismissed).

prudence.[221] The court also struck Respondent's amended complaint and ordered him to file a second amended complaint.[222]

On October 25, 2011, the Keith court granted BP's motion for summary judgment.[223] The court noted that Respondent wholly failed to respond to BP's summary judgment motion and instead moved for discovery without following the mandates of C.R.C.P. 56(f).[224] The court also found that Respondent failed to "place in an affidavit the facts with which he was made aware prior to the filing of the initial complaint that show that drilling into lower formations is commercially reasonable." [225] Thus, the court concluded that additional discovery was not likely to yield any evidence that the lower formations could be developed in a reasonably commercial manner. Finally, the court declined to sift through the 1,500 pages of exhibits Respondent had presented because he had not cited any of the documents in his motions.[226]

On October 31, 2011, Dugan wrote to Respondent, advising him under C.R.C.P. 11 that while preparing discovery he had located a letter dated April 27, 2007, sent from BP's former counsel to Respondent enclosing a fully executed settlement agreement and a check to Cugnini Land for $46,468.15.[227] Dugan reminded Respondent that the Cugnini Land settlement agreement referenced the Parry settlement and contained a release of claims against BP, which he opined included the claims Respondent had brought in the Cugnini case.[228] Finally, Dugan advised Respondent that he would seek sanctions under C.R.C.P. 11 unless Respondent dismissed the case.[229]

Respondent testified that after receiving this letter in October 2011, he met with Miller for the first time; Miller gave him copies of the public Parry settlement documents, which he also reviewed for the first time. Respondent said that it never crossed his mind to ask Miller whether the plaintiff class members and BP had a meeting of the minds in entering the Parry settlement. Nor did he remember discussing with Miller whether the language in section 1.38 of the Parry settlement barred Keith's, Watson's, or Cugnini's claims against BP. Respondent did not dismiss the Cugnini case as he believed Judge Dickinson's order in Parry approving the class settlement was void because the released claims exceeded the certified class claims in the amended complaint.

In November 2011, BP moved for summary judgment on Respondent's remaining claim in Cugnini, arguing that the Cugnini Land and Parry settlements barred Cugnini's claims.[230] Respondent disagreed with Dugan's interpretation of the settlement.[231] He also argued that the court lacked jurisdiction to determine whether Parry precluded his client's claims, arguing that only Judge Dickinson had the authority to do so.[232] Respondent did not submit any affidavit to his response to BP's summary judgment motion. He testified that he did not even think to include an affidavit from Miller describing his interpretation of Parry, because he was focused on his own interpretation of the laws governing class certification.

On November 4, 2011, the Watson court granted BP's motion for summary judgment.[233] In that order, the court noted that this case "was remarkably similar, both fac-

221. See Ex. S776 at 11866.

222. Ex. S776 at 11867.

223. Ex. S315.

224. Ex. S315 at 03881-84.

225. Ex. S315 at 03883.

226. Ex. S315 at 03883.

227. Ex. S1005.

228. Ex. S1005.

229. Ex. S1005.

230. See Ex. S780 at 11898-908 (motion filed on November 25, 2011).

231. See Ex. S789 (filed January 5, 2012).

232. See Ex. S789 at 12043-44.

233. Ex. S571. Judge David A. Cole, a senior judge sitting on assignment, issued the ruling on BP's summary judgment motion.

tually and procedurally," to the Keith case, and adopted the Keith court's ruling on BP's summary judgment motion.[234] In addition, the court deemed Respondent's complaint frivolous and groundless under C.R.S. section 13-17-101, awarding BP attorney's fees and costs.[235]

On November 7, 2011, Dugan again wrote to Respondent, notifying him that the Watson Trust's and the Keith Family's claims were barred by their predecessors' participation in the Parry settlement agreement.[236] Dugan warned Respondent that he would pursue sanctions under C.R.C.P. 11 if Respondent did not dismiss these cases.[237] Respondent did not respond. Dugan explained that it took him some time to discover that Respondent's clients were successors to participants in the Parry settlement agreement. Dugan testified that he assumed that Respondent had done his research before filing the complaints in these cases and that Respondent's clients were among the 300 people who had opted out of the Parry settlement. Dugan did not discover that his assumption was incorrect until he reviewed discovery documents in the Cugnini case. Respondent testified that he advised both clients of the risks of continuing to litigate in light of Dugan's letters. He maintained that his clients wished to proceed.

Respondent did not dismiss the Keith and Watson cases. Rather, under C.R.C.P. 59 and 60 he moved in the Watson case on November 21, 2011, to correct error, set aside default, and order new trial on summary judgment.[238] In those motions, he admitted he was unfamiliar with the mandates of C.R.C.P. 56(f) and also argued that the court should have sorted through the 1,500 pages of documents in any event.[239] He then untimely attached his own affidavit and an affidavit from Miller in support of reconsideration.[240] BP opposed this motion and asked for sanctions in light of Ms. Watson's prior participation in the Parry settlement.[241] On November 24, 2011, in the Keith case, Respondent filed an essentially identical C.R.C.P. 59 and 60 motion and affidavits.[242]

On December 6, 2011, BP moved for sanctions under C.R.C.P. 11 and C.R.S. section 13-17-101 based on the Keith Family's predecessor's release of claims in the Parry settlement.[243] BP averred that after it gave Respondent actual notice of the Parry settlement on November 7, he had no reasonable basis to continue the case.[244] BP further asserted that it had amassed substantial attorney's fees in responding to Respondent's C.R.C.P. 59 motion.[245] Respondent responded on December 31, 2011.[246] He argued that the court had no jurisdiction to determine whether the Keith claims were barred by Parry; that Keith claims had not been released by Parry, because they were not based on the wrongful deduction of post-production costs; and that the Parry plaintiff class members did not

---

234. Ex. S571 at 08321-22. The court made the same determinations as the court in Keith concerning Respondent's request for discovery, his request to depose BP's engineer, and his failure to file a C.R.C.P. 56(f) affidavit or to provide citations to 1,500 pages of documents. Ex. S571.

235. Ex. S571 at 08324.

236. *See* Exs. S1003 & S1004 (letters dated November 7, 2011).

237. Exs. S1003 & S1004.

238. Ex. S581.

239. Ex. S581 at 08413-14.

240. *See* Ex. S581 at 08414.

241. *See* Ex. S585 at 08515-19. Miller testified that Respondent asked him to prepare an affidavit so that he could submit it with his post-judgment motions. Miller was not permitted to testify at any sanctions hearing.

242. Ex. S323.

243. Ex. S331.

244. Ex. S331.

245. Ex. S331 at 04077.

246. Ex. S337. Respondent filed a similar response in Watson to BP's sanctions motion, arguing that the Parry settlement release was limited to the claims actually raised in the first amended complaint and asking the court to stay the case until Judge Dickinson ruled whether the Parry settlement agreement barred his clients' claims in Keith, Watson, and Cugnini. Ex. S592. Respondent made this request even though Judge Dickinson was assigned to the Watson case.

have authority to settle claims similar to those brought in Keith.[247] Respondent then requested a hearing on BP's sanctions request. The court granted that request, limiting the scope of the sanctions hearing to whether Respondent knew or should have known the terms of the Parry settlement agreement and to the reasonableness of BP's requested attorney's fees and costs.[248]

On January 19, 2012, the Watson court denied Respondent's post-judgment motion and granted Respondent's request for a sanctions hearing.[249] Respondent then moved to stay the proceedings regarding attorney's fees and costs.[250]

On January 23, 2012, the Cugnini court granted BP's summary judgment motion, determining that the Parry settlement agreement barred Cugnini's complaint.[251] The court rejected Respondent's objections to the Parry settlement because Cugnini's predecessor had opted out of the class action settlement and had no standing to object.[252] Four days later, Dugan asked Respondent not to file a motion to reconsider, noting that it might result in additional sanctions.[253] Respondent, however, ignored Dugan's advisement and moved for reconsideration on February 5, 2012.[254] He continued to argue that the Parry settlement did not bar his client's claims.[255] He also raised a new argument that his client's claims had accrued after 2007.[256] This motion was denied on March 2, 2012.[257] Respondent testified before the Hearing

Board that the court's ruling did not cause him to reevaluate his understanding of Parry because he did not agree then—or now—that Parry precluded his client's cause of action. Respondent testified that he advised Cugnini about the risks of continuing to file motions and to appeal the court's ruling but that his client wanted to proceed.

On February 20, 2012, Respondent moved under C.R.C.P. 121 section 1-22(2)(b) in the Keith case to conduct additional discovery as to whether leasehold development claims were part of the Parry settlement.[258] Two days later, he filed an identical request in Watson.[259] In those motions, Respondent sought discovery concerning BP's intent in entering into the Parry settlement and asked to depose BP's counsel in Parry regarding BP's mental impressions.[260]

On March 1, 2012, Respondent appealed the Watson court's summary judgment order and denial of his request to depose BP's petroleum engineer.[261] In that appeal, Respondent argued in part that he was denied due process when he could not depose BP's engineer and that there was a disputed issue of fact.[262] He again argued that BP could have profitably developed wells on his client's property, based on evidence from nearby producing wells.[263]

Respondent moved for an evidentiary hearing in the Cugnini case on March 8, 2012, concerning BP's request for attorney's fees and costs.[264] He asked to present expert

**247.** See Ex. S337.

**248.** Exs. S342 (request for hearing) & S352 (court's order).

**249.** Exs. S606, S607, & S608.

**250.** Ex. S610 (filed January 30, 2012); Ex. S611 (BP's response in opposition).

**251.** Ex. S794 at 12378-79.

**252.** Ex. S794 at 12378.

**253.** Ex. S1006.

**254.** Ex. S795.

**255.** Ex. S795.

**256.** Ex. S795 at 12385-86.

**257.** Ex. S804 (declining to consider Respondent's argument that his client's claims accrued

after 2007 because he had failed to raise that argument in response to BP's motion for summary judgment).

**258.** Ex. S354.

**259.** Exs. S616 & S617 (BP's response in opposition).

**260.** See Ex. S616 at 09269.

**261.** Exs. S694 (notice of appeal) & S705 (opening brief filed on June 13, 2012).

**262.** See Ex. S705 at 10866-89.

**263.** See Ex. S354.

**264.** See Exs. S809 (response) & S798 (BP's motion for attorney's fees and costs dated February 16, 2012).

testimony from Miller and to conduct additional discovery regarding BP's intent in entering into the Parry settlement agreement.[265] That same day, Respondent filed a motion for stay pending his appeal of the court's summary judgment ruling.[266] Four days later, he also requested additional discovery to depose BP's counsel in the Parry case.[267] On April 16, 2012, the Cugnini court denied Respondent's motion for stay and his request for additional discovery because the Parry issue had been decided on summary judgment.[268] The court permitted an evidentiary hearing on BP's request for sanctions but limited the hearing's scope to the reasonableness of BP's requested attorney's fees and costs.[269]

On March 29, 2012, Respondent moved to compel BP to produce the memorandum of understanding from the Parry settlement negotiations or to dismiss its Parry-based assertions in the Keith case.[270] Miller testified that the memorandum of understanding was a confidential settlement document and that only the final stipulation and settlement agreement was made public. On April 3, 2012, the court denied all of Respondent's pending motions.[271] Three days later, the Keith court held a sanctions hearing.[272] There, Respondent first submitted an affidavit from Miller in support of his argument that Parry did not bar his claims, but the court rejected this untimely affidavit.[273]

On April 16, 2012, the Watson court denied all of Respondent's pending post-judgment motions.[274] In that order, the court determined that Respondent had "flooded the Court with pleadings seeking to relitigate the issues addressed in summary judgment, discovery related to [those] claims, and attack the validity of the settlements" in Parry.[275] The court noted that even so, Parry did not form the basis for summary judgment but was relevant rather only to the issue of the reasonableness of BP's attorney's fees.[276] The court further held that, regardless, Parry was unambiguous and barred his client's claims.[277] The court observed that Respondent's motions were "needless litigation that [do] nothing but clog the Court's already overburdened docket."[278] Respondent testified that this ruling and the threat of heavy sanctions did not cause him to change his position on whether Parry barred his client's claims or, indeed, to cease pursuing those claims.

On June 5, 2012, the Cugnini court awarded BP attorney's fees against Respondent, individually, for $18,736.25, and the court awarded costs against Respondent and his client jointly and severally for $14,719.36.[279] In that order, the court stated that "[t]he entire case from the filing of the initial complaint through the attorney fees hearing, the pleadings, legal theories and arguments of counsel were so devoid of merit that at times it was difficult to understand what was being argued."[280] Respondent later discharged his financial obligations under this order in bankruptcy.

On June 27, 2012, the Keith court issued sanctions jointly and severally against Re-

265. Ex. S809 at 12531-34.

266. Ex. S807.

267. Ex. S817.

268. Ex. S823 at 12712.

269. Ex. S823 at 12712.

270. Ex. S381.

271. Ex. S387. This order was issued by Judge David R. Lass, sitting on assignment as a senior judge.

272. *See* Ex. S402 at 05593.

273. *See* Ex. K. Respondent stated that he did not submit Miller's affidavit in Keith or Watson in response to BP's motion for summary judgment because Parry was not yet at issue. Nor did he submit Miller's affidavit in Cugnini in response to BP's motion for summary judgment.

274. Ex. S637.

275. Ex. S637 at 09583-84.

276. Ex. S637 at 09584.

277. Ex. S637 at 09584.

278. Ex. S637 at 09584.

279. Ex. S831 at 12780-81.

280. Ex. S831 at 12780.

spondent and the Keith Family in the amount of $223,448.66.[281] In that order, the court found that the Parry settlement agreement unambiguously and broadly released "any alleged class claims arising from leased mineral interests in La Plata and Archuleta Counties, including claims involving allegations that BP failed to act in good faith, failed to act as a prudent operator, or otherwise breached an express or implied covenant."[282] The court noted that Dugan reasonably assumed Respondent was aware of the Parry settlement and that Keith must have been one of the opt-outs.[283] The court concluded that Respondent " 'knew, or reasonably should have known' . . . the terms of the *Parry* Settlement before commencing this action in 2010," reasoning that Respondent should have known about the terms in 2007 when he notified BP that his client Cugnini Land wanted to accept the terms and conditions of the Parry settlement.[284] The court was surprised that Respondent did not even read the Parry settlement until November 2011.[285] The court also found Respondent did not make reasonable inquiries about the facts before filing the complaint because if he had, he would have determined that the Parry settlement barred his client's claims.[286] Finally, the court found that Respondent's post-filing behavior was likewise unreasonable, that Respondent either knew or reasonably should have known that his client's claims could not succeed, and that his post-pleading actions were "arbitrary, abusive, stubbornly litigious or disrespectful of the truth." [287] Again, Respondent discharged these sanctions in bankruptcy.

Respondent testified that even when faced with the Keith sanctions order, he never believed his claims were frivolous. In fact, he maintained he was making a good faith effort to answer a question for thousands of plaintiff class members as to whether their claims were barred by Parry.

On October 9, 2012, Respondent appealed the Keith court's award of sanctions based on the release of claims in Parry settlement agreement.[288] In that appeal, Respondent averred in part that: section 1.38 of the Parry settlement only included "matters alleged in" the first amended complaint; under class action law, a judgment could only dispose of certified class claims; because the Parry settlement had never been interpreted by a Colorado court he had made a good faith attempt to establish a new legal precedent and sanctions were not appropriate; his inability to conduct discovery amounted to a denial of due process; BP was estopped from asserting Parry's applicability; and his client's claims had reaccrued and were thus not barred by Parry.[289] Respondent testified here that he relied on *National Super Spuds, Inc. v. New York Mercantile Exchange* in support of his due process claims.[290] He stated that *Super Spuds* stood for the proposition that a judgment in a class action approving a settlement could not extinguish claims that were not asserted in the class complaint.

On October 11, 2012, the Colorado Court of Appeals affirmed the Keith court's grant of summary judgment in a separate appeal filed by Respondent.[291] In that appeal, Respondent argued that he was entitled to additional discovery under C.R.C.P. 26, and specifically that BP did not properly disclose as and expert their affiant as an expert, whom he should have been able to depose.[292] He also

---

**281.** Ex. S402. This order was amended on August 12, 2012, to add additional attorney's fees and costs in favor of defendant Schultz Energy. See Ex. S411.

**282.** Ex. S402 at 05599.

**283.** Ex. S402 at 05600.

**284.** Ex. S402 at 05600.

**285.** Ex. S402 at 05601.

**286.** Ex. S402 at 05602.

**287.** Ex. S402 at 05602. The court made the same determinations as to the Keith Family. See Ex. S402.

**288.** Ex. S503.

**289.** Ex. S503 at 06567-68.

**290.** 660 F.2d 9, 16-18 (2d Cir. 1981).

**291.** See Ex. S487. Respondent filed his opening brief in this appeal on June 11, 2012. See Ex. S478.

**292.** Ex. S478 at 06050-51.

argued that the court erred with respect to his allegations that BP had breached the covenant to reasonably develop Keith's lease; he contended, in part, that the court only considered BP's position and that BP's abandonment of the lease could be inferred from the 1,500 pages he submitted to the district court.[293] In its opinion, the court of appeals deemed the Keith court's ruling on summary judgment correct, given that Respondent wholly failed to respond to the summary judgment motion.[294] The court of appeals also found that the appeal was frivolous because Respondent failed to establish a basis for his arguments, which made BP's attempts to respond difficult. Further, the court of appeals concluded, some of Respondent's arguments post-dated the subject of the appeal.[295] The court remanded the case to the district court for a determination of BP's appellate attorney's fees.[296]

On November 15, 2012, the Colorado Court of Appeals affirmed the Cugnini court's summary judgment order and imposition of sanctions.[297] The court of appeals determined that "any implied obligations to act in good faith and to develop minerals in a commercially reasonable manner [were] unambiguously included within [the] definition" of settled claims in the Parry settlement agreement and were incorporated into the 2007 Cugnini settlement agreement.[298] The court rejected Respondent's argument that the settled claims only included those asserted in the class complaint and identified in the class certification, since the definition of settled claims included those asserted and those " 'which could be based upon' matters alleged in the first amended complaint." [299] It also noted that the definition of "settled claims

was followed by a lengthy recitation of the types of claims released, which, as noted, expressly included prudent operator claims." [300] The court of appeals declined to consider objections to the Parry settlement because Cugnini Land had opted out of the class action, and it declined to consider Respondent's objections to attorney's fees and costs because he failed to file a separate appeal.[301] Finally, the court of appeals determined that Respondent's appeal was "substantially frivolous" and remanded the case to the district court to determine the amount of BP's attorney's fees.[302]

Respondent filed a reply in the Keith appeal on December 2, 2012, despite an adverse ruling by the same court in Cugnini less than a month prior.[303] Respondent continued to argue that the Parry settlement agreement did not bar Keith's claims and that his interpretation of the Parry settlement terms was a good faith attempt to establish a novel theory of law, which exonerated him from sanctions.[304]

On December 6, 2012, the Colorado Court of Appeals affirmed the Watson court's summary judgment order.[305] In that opinion, the court of appeals found that Respondent, in failing to respond to BP's summary judgment, had neglected to put forth evidence demonstrating the economic viability of BP's exploration or drilling on the leasehold.[306] It noted that Respondent failed to move under C.R.C.P. 56(f) for additional discovery.[307] The court of appeals declined to consider Respondent's arguments that he did not file in response to BP's motion for summary

**293.** Ex. S478 at 06051.

**294.** Ex. S487 at 06478.

**295.** Ex. S487 at 06479.

**296.** Ex. S487 at 06479.

**297.** Ex. S876; *see also* Exs. S857 (notice of appeal), S865 (opening brief), & S867 (answer brief).

**298.** Ex. S876 at 13248-50.

**299.** Ex. S876 at 13250.

**300.** Ex. S876 at 13250.

**301.** Ex. S876 at 13250 n.3 & 13251-53.

**302.** Ex. S876 13253-54.

**303.** Ex. S508.

**304.** *See* Ex. S508.

**305.** Ex. S709.

**306.** Ex. S709 at 11054.

**307.** Ex. S709 at 11057-58.

judgment.[308] The court concluded that Respondent's appeal was frivolous because the trial court's ruling on summary judgment was "so plainly correct and the legal authority contrary to [Respondent's] position so clear" that there was no appealable issue, and because Respondent "wholly failed to respond" to BP's motion for summary judgment despite warnings.[309] And the court found that Respondent's appeal was frivolous as argued because Respondent failed to distinguish the basis for his arguments, and he raised issues that post-dated the subject of the appeal.[310] The court remanded for a determination of BP's attorney's fees on appeal.[311]

On February 28, 2013, the Watson court issued sanctions against Respondent in the amount of $134,573.55—which he later discharged in bankruptcy—and against his client in the amount of $44,857.85.[312] In that order, the court concluded that Respondent and his client did not properly evaluate the implied covenant to develop claims; that Respondent did not present any material evidence showing that BP could profitably develop the lower formation under his client's property; that such evidence should have been obtained before filing suit; that instead of withdrawing the claim after receiving undisputed contrary evidence, he continued to file numerous motions; that the action was not pursued in good faith because Respondent's client refused to allow BP onto the property to drill a fourth well and then sued BP for its failure to drill; that Respondent caused BP extensive work by filing 1,500 pages of random agency documents with little relevance; and that attorney's fees were reasonable in light of Ms. Watson's participation in the Parry settlement agreement,

which clearly released her claim of breach of the implied covenant to develop.[313]

Again, Respondent testified that the Watson court's ruling—even coupled with numerous other adverse rulings—did not cause him to question his analysis of the Parry settlement agreement because he believed the courts had not evaluated the cases he cited or even looked at the first amended complaint in Parry. Respondent agreed that Parry released claims against BP for breaches of the implied covenants, but he testified that he thought that Parry covered a different category of implied covenants, although he did not discuss this theory with Miller or elaborate on it here.

On March 28, 2013, the Colorado Court of Appeals affirmed the Keith court's award of sanctions, determining that Respondent's appeal was frivolous and remanding for a determination of BP's attorney's fees.[314] After conducting a *de novo* review, the court of appeals determined that Keith's claims were barred by Parry because the claims fell within the defined settled claims and the client's predecessor was a compensated class member.[315] The court of appeals also noted that Respondent had alleged BP breached implied covenants and failed to act as a prudent operator yet the Parry settlement "explicitly include[d] *all* claims of breach of an implied covenant and failure to operate the leasehold as a prudent operator." [316] The court of appeals noted that Respondent knew of the Parry settlement yet failed to read it before filing suit. [317] The court further determined that the law involving contract interpretation is robust and Respondent therefore lacked a novel legal position to advance claims that

**308.** Ex. S709 at 11059-60.

**309.** Ex. S709 at 11063.

**310.** Ex. S709 at 11064.

**311.** Ex. S709 at 11064.

**312.** Ex. S648. Respondent appealed this order on April 10, 2013. Exs. S714 (notice) & S726 (opening brief).

**313.** *See* Ex. 648.

**314.** Ex. S509.

**315.** Ex. S509 at 06760-61. Although Respondent raised seven claims on appeal, the court of appeals limited its analysis to the Parry settlement. It also refused to consider Respondent's claim that the Keith cause of action reaccrued, because he did not provide any relevant legal citations nor advance any cogent argument. Ex. S509 at 06771.

**316.** Ex. S509 at 06761.

**317.** Ex. S509 at 06762.

had been previously settled by agreement.[318] Finally, the court of appeals determined Respondent's appeal was frivolous; it noted that his argument was dependent on a favorable ruling that Parry did not preclude his client's claims, yet another division of the court of appeals had previously concluded the opposite with respect to claims that were essentially the same claims in Keith.[319] Respondent's "failure to dismiss this appeal after the opinion in Cugnini was announced was without justification and lacked any rational basis," the court of appeals held.[320] Respondent testified that the court of appeals' opinion did not cause him to rethink his analysis of Parry because he believed the court of appeals erred.

On January 29, 2014, the court of appeals affirmed the Watson court's award of sanctions and found that appeal frivolous.[321] In the Watson appeal, Respondent made arguments similar to those he had raised in Keith, as described above.[322] Here, the court of appeals observed that Respondent had represented parties in other matters asserting identical claims, and in each of those cases, his claims were dismissed and the district courts and other divisions of the court of appeals had determined those claims and arguments to be frivolous.[323] The court of appeals remanded the case to the district court to determine BP's attorney's fees and costs on appeal.[324]

### Colo. RPC 1.1

■ The People allege that Respondent acted incompetently in violation of Colo. RPC 1.1 when he filed the complaints and appeals in the Keith, Watson, and Cugnini matters

without having adequately analyzed substantive and procedural aspects of the relevant oil and gas law and without reasonably preparing these three matters.[325] We conclude that the People have proved these claims by clear and convincing evidence.

First, we conclude that Respondent failed to employ the requisite skill, thoroughness, and preparation when he brought the three cases against BP without first reviewing the Parry settlement agreement. Respondent knew about the agreement in 2007 when he negotiated the Cugnini Land settlement, which incorporated the Parry settlement. Respondent also knew that the Keith Family and the Watson Trust were successors of plaintiff class members in Parry. But Respondent wholly neglected to read the Parry settlement agreement in 2007 or before filing the Keith, Watson, and Cugnini cases in 2010, though he knew that the clients had agreed to release claims against BP. Rather, he chose not to read the Parry settlement until November 2011. We believe that a reasonable attorney would have reviewed the Parry settlement agreement before determining whether to proceed against BP in the three litigations.

Next, we find that Respondent acted incompetently in all three matters when he filed claims against BP for breach of the implied covenant to develop the leaseholds and for failure to act as a prudent operator. He filed those claims without conducting an adequate investigation and without employing the requisite legal knowledge. For instance, in the Keith and Watson complaints Respondent advanced arguments that were altogether incomprehensible.[326] Additionally,

318. Ex. S509 at 06764-65.

319. Ex. S509 at 06772-73.

320. Ex. S509 at 06773.

321. Ex. S733 at 11407-19.

322. See Ex. S726. He also filed a one-sentence motion to dismiss the appeal on December 1, 2013. Ex. S733 at 11405-06. This motion was denied. See Ex. S733 at 11413 (declining to dismiss the appeal to serve the interests of justice and fairness because Respondent had reason to believe that the court of appeals would conclude that his appeal was frivolous and because BP and

the court had devoted substantial resources to this case).

323. Ex. S733 at 11414.

324. Ex. S733 at 11417-19.

325. Colo. RPC 1.1 cmt. 4.

326. See In re Willis, 505 A.2d 50, 50 (D.C. 1985) (finding that pleadings were sloppy, incoherent, incomplete, and misleading); In re Hogan, 112 Ill.2d 20, 22-23, 96 Ill.Dec. 75, 490 N.E.2d 1280, 1281 (1986) (finding that a lawyer lacked a fundamental skill when he filed nineteen pleadings

in Keith and Cugnini, Respondent ignored the court's directives and filed amended complaints containing previously dismissed claims, which required BP to move to strike the duplicative claims. Moreover, we conclude that in general, Respondent was unable to accurately analyze relevant case law and legal principles and apply them to his clients' cases.[327] For instance, Respondent failed to appreciate that the onus was on his clients to prove BP's failure to act as a prudent operator by demonstrating that BP should have explored further or developed the leaseholds; he asked the court to shift the burden of proof to BP to prove profitability when such a request was contrary to Colorado law; he continued to argue that it was impossible for his clients to prove profitability; he made multiple attempts to ascertain the intent of the parties to the Parry settlement when such a request ignored the confidential nature of settlement negotiations;[328] he failed to grasp why Judge Dickinson had jurisdiction to determine whether Parry precluded his client's claims; and he stubbornly moved to present expert testimony concerning BP's intent regarding the Parry settlement agreement, even though the court had previously ruled that his client could not object to any of the procedures in Parry because it had opted out of the class.

Although Respondent may have initially stated sufficient facts in his complaints to satisfy Colorado's notice pleading requirement and to survive BP's motions to dismiss, he did not conduct an adequate investigation before filing suit and thereafter failed to discover facts specific to each leasehold to meet his burden. He instead chose to relentlessly pursue these claims without an adequate foundation. Nevertheless, Respondent then demonstrated incompetence when he failed to respond to BP's motions for summary judgment or to counter BP's affiant with controverted material facts as required under C.R.C.P. 56.[329] He displayed a further misunderstanding of the summary judgment rules when he requested discovery under C.R.C.P. 26, rather than C.R.C.P. 56(f).[330] And he neglected to review C.R.C.P. 56 when presented with a motion for summary judgment, instead relying on his decades-old understanding of the Indiana rules of civil procedure. Also, in the Watson and Keith cases he asked the court to strike BP's summary judgment motion and submitted 1,500 pages of documents with no citations, expecting the court to wade through reams of paper for evidence of profitability. His failure to offer any facts demonstrating the economic viability of additional exploration or drilling on the Keith Family or Watson Trust leaseholds

or briefs containing incomprehensible arguments and writing).

**327.** *See Lecznar,* 690 So.2d at 1285-86 (finding that a lawyer's failure to name an insurance company as a defendant in a personal injury suit within the statutory time limit indicated a failure to understand relevant legal doctrines or procedures). We note that the Keith, Watson, and Cugnini courts dismissed a number of Respondent's claims, finding in part that he failed to join indispensible parties, failed to state several other claims for relief, and to exhaust administrative remedies. These rulings further demonstrate Respondent's lack of competence, though we do not base our rule violation findings on these failings.

**328.** *See* C.R.S. § 13-22-307 (1991) ("Any party or the mediator or mediation organization in a mediation service proceeding or a dispute resolution proceeding shall not voluntarily disclose or through discovery or compulsory process be required to disclose any information concerning any mediation communication or any communication provided in confidence to the mediator or a mediation organization....").

**329.** *See Ryan v. Ryan,* 260 Mich.App. 315, 677 N.W.2d 899, 909 (2004) (the filing of a complaint without the required verification or supporting affidavits "calls into question the competence and good faith of the plaintiff's attorney").

**330.** *See* C.R.C.P. 26(a)(1)(A)-(D) (requiring that once a case is at issue, litigants must automatically disclose individuals with discoverable information relevant to the claims and defenses); C.R.C.P. 26(a)(2)(A)-(C) (setting forth deadlines for expert witness disclosures as triggered by a trial date); *WRWC, LLC v. Arvada,* 107 P.3d 1002, 1006 (Colo. App. 2004) ("Plaintiff's speculation that further discovery may uncover such facts is insufficient.... Although plaintiff could have moved the trial court for a continuance under C.R.C.P. 56(f) to conduct further discovery, it made no such motion."); *In re Estate of Heckman,* 39 P.3d 1228, 1231 (Colo. App. 2001) (finding that because the plaintiff did not submit an affidavit under C.R.C.P. 56(f), the trial court did not err in failing to defer ruling on the defendant's motion for summary judgment).

demonstrates to us that he failed to appreciate his burden of proof before filing these cases.

■ Further, throughout all three of these cases, Respondent exhibited a flawed understanding of the relevant procedural rules and a failure to recognize the importance of following courts' instructions.[331] For example, his post-judgment motions in the Keith and Watson cases displayed a lack of preparation and understanding of the procedural rules.[332] He not only asked the courts to set aside default and to order a new trial—even though no default had been entered and no trial had been held—but he also attempted to untimely submit evidence in an effort to raise a disputed issue of fact—evidence that should have been presented on summary judgment and could not properly have been considered by a court at a later stage.[333] Respondent's conduct displays a lack of basic awareness and research of the rules governing dispositive motions practice. After BP requested attorney's fees in Watson, Respondent failed to respond to BP's request for attorney's fees or to contest the reasonableness of BP's fees as he should have done, instead arguing that his client's claims had merit. In his Rule 59 motions in Cugnini, Respondent raised the new argument that his client's claim accrued after 2007, though that argument had not been before the court on summary judgment.

■ Lawyers need not have special training or prior experience before agreeing to handle a matter involving an area of law with which the lawyer is unfamiliar.[334] A lawyer can provide competent representation through study or association with experienced practitioners.[335] Although we believe that Respondent tried to engage in the necessary study to become competent in this particular field—such as consulting some with other lawyers and conducting substantial research—we do not agree with him that his preparation was adequate. Despite his preparation, he was unable to determine what kind of legal problems his clients' cases might involve, including whether their claims were barred by a prior settlement agreement. Further, on many occasions he had a confused understanding of the leading case law. Knowing that he lacked experience in oil and gas litigation, Respondent should have at least associated with a lawyer of established competence in these types of cases. Even though Respondent testified that he consulted with Miller and Ledbetter on occasion during these three cases, there is no evidence that he sought their counsel on the specific claims he brought, requested their advice about whether the Parry settlement barred his clients' claims, or asked them to review any of his pleadings. By failing to take such actions, particularly in light of the complex legal problems he faced in these cases, Respondent did not competently represent his clients.

331. Our analysis of Respondent's rule violations does not rest on other judicial rulings made in the three cases. Rather, we reach our own conclusions based on the additional evidence—including these rulings—presented at the disciplinary hearing. *Fitzgibbons*, 909 P.2d at 1104 (finding the conclusions of the district court and court of appeals were evidence that the respondent's claims were frivolous and groundless); *In re Egbune*, 971 P.2d at 1067 (noting that a trial court's ruling did not bind a hearing board because proof in civil actions typically is by a preponderance of the evidence, while in disciplinary proceedings proof is by clear and convincing evidence).

332. *See In re Laprath*, 670 N.W.2d 41, 61-63 (S.D. 2003) (finding that a lawyer demonstrated lack of understanding of basic legal procedure in multiple client matters).

333. *See Conrad v. Imatani*, 724 P.2d 89, 94 (Colo. App. 1986) (holding that affidavits submitted after summary judgment was granted could not be considered on a motion to reconsider); *Witcher v. Canon City*, 716 P.2d 445, 457 (Colo. 1986) ("A motion for summary judgment supported by an affidavit, to which no counter-affidavit is filed, presents no issue of fact and the court is entitled to accept the affidavit as true.").

334. *See* Colo. RPC 1.1 cmt. 2 ("A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar.... A lawyer can provide competent representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.").

335. *Id.*

Finally, Respondent evinced a lack of preparation during the Keith and Watson appeals. In Keith, he raised arguments that were not properly before the court of appeals and failed to flesh out his arguments, making it difficult for BP to respond to his briefs. Respondent attempted to voluntarily dismiss his appeal in Watson through a one-sentence motion.[336] In Cugnini, he again disregarded appellate rules by failing to separately appeal BP's award of attorney's fees or to file an amended notice of appeal as mandated by the rules.

We thus conclude the People have proved by clear and convincing evidence that Respondent violated Colo. RPC 1.1 in the Keith, Watson, and Cugnini cases.

### Colo. RPC 3.1

The People charge Respondent with knowingly violating Colo. RPC 3.1 in the Keith, Watson, and Cugnini cases by advancing meritless claims and contentions in the complaints, in subsequent motions, and on appeal. Although Respondent made numerous arguments and defenses in these cases, we limit our analysis to his claims that BP breached the implied covenant of development by failing to act as a prudent operator, and his defenses to whether the Parry settlement barred his clients' claims.[337]

■■■ As previously discussed, we use an objective standard to analyze whether Respondent's claims in these three cases were frivolous. A claim is frivolous if the proponent can present no rational argument based on the evidence or law in support of that claim or defense.[338]

■■■ We conclude the People have proved by clear and convincing evidence that Respondent violated Colo. RPC 3.1 on two grounds in the Keith, Watson, and Cugnini cases. As stated above, Respondent had the burden to prove his clients' claims that BP breached the implied covenant of reasonable development and failed to act as a prudent operator. Although we do not find that it was frivolous from the outset of these cases for Respondent to have advanced these claims, we do find that he had a continuing obligation to revaluate the factual predicates of his clients' claims, yet he failed to do so. While Respondent's factual allegations with respect to these claims were sufficient to survive BP's motions to dismiss, he thereafter did not produce the requisite evidentiary support for these claims, despite being given additional time to file amended complaints.[339] Further, when BP submitted evidence demonstrating that the formations in the relevant leaseholds were thinning and that it had acted as a prudent operator in deciding not to further explore or develop the leaseholds, Respondent did not counter this evidence. Instead, he simply failed to respond to BP's summary judgment motions in Keith and Watson, and he declined to submit a timely countervailing affidavit in any of the three cases to raise a disputed issue of fact. This leads us to believe he had no evidence to support his allegations that BP had breached the implied covenant to reasonably develop or had failed to act as a prudent operator.[340] Perhaps realizing he could not meet this burden, he attached 1,500 pages of COGCC records with no citations to relevant informa-

---

**336.** See C.A.R. 42(b) (providing for a dismissal of an appeal where the parties file a signed dismissal agreement specifying how costs and fees will be paid).

**337.** As we stated earlier, although Respondent made several claims for relief in his complaints, only his claim that BP failed to act as a prudent operator by neglecting to develop the leasehold survived BP's motion to dismiss, and we thus focus on this claim in our analysis.

**338.** W. United Realty, 679 P.2d at 1069.

**339.** See C.R.C.P. 11 ("The signature of an attorney constitutes a certificate by him ... that to

the best of his knowledge, information, and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law....").

**340.** See W. United Realty, Inc., 679 P.2d at 1069 (finding that a claim is substantially groundless if the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial); Witcher v. Canon City, 716 P.2d 445, 457 (Colo. 1986) ("A motion for summary judgment supported by an affidavit, to which no counter-affidavit is filed, presents no issue of fact and the court is entitled to accept the affidavit as true.").

tion, hoping the court would reconsider its ruling.

We credit Dugan's interpretation of the case law governing breach of the implied covenant of reasonable development and his opinions about how a reasonable lawyer would have litigated these cases. According to Dugan, because profitability is site specific, a reasonable lawyer would have gathered substantial data supporting claims of profitability before filing a breach of implied covenant claim, including by investigating the property and the lands nearby, contacting a scientist or an engineer for an opinion, checking COGCC records, and reading the available scientific literature about the San Juan Basin. Respondent failed to act according to the standards of a reasonable lawyer.

We also reject Respondent's defense that his clients did not have the burden of proof in these three cases. While testifying before the Hearing Board, Respondent proclaimed his reliance on *Whitham Farms* and *Gillette*. But we are not persuaded by Respondent's interpretation of these cases and disagree that the cases mandate that an oil company has a duty to conduct exploratory drilling in each space on a unit to determine profitability. *Whitham Farms* is clear that where there is a proven reservoir of oil and gas—as there were in all three of Respondent's cases—the lessee is required to further develop the lease only when there is a reasonable expectation that one or more new wells would be profitable.[341]

We also do not agree with Respondent that whether his clients had the burden to prove a breach of the implied covenant of reasonable development was an open question in Colorado. Although the Colorado Supreme Court had accepted certiorari in the *Whitham Farms* case in 2004 to determine, among other issues, whether the Colorado Court of

Appeals had erred by holding that the burden of proof is on the lessor to show breach of an implied covenant in an oil and gas lease, the parties to that case settled, and the issue was never resolved by the Colorado Supreme Court.[342] Thus, when Respondent brought claims against BP for breaches of the implied covenant of reasonable development and failure to act as a prudent operator, the *Whitham Farms* and *Gillette* cases were binding law and his clients had the burden of proof.[343] We have little difficulty deeming frivolous Respondent's continued assertion that his clients did not bear the burden of proof. The law is clear and has been since 2004; Respondent presented no rational argument to the contrary. While it was reasonable for Respondent to raise this issue to preserve it for appeal, it became patently frivolous for him to raise his argument again and again.

Next, we determine that it was frivolous for Respondent to file complaints for his three clients without fully informing himself of the facts of his clients' cases to determine whether he could proceed with their claims. Respondent admitted that he failed to read the Parry settlement agreement and to investigate whether Parry precluded his clients' claims in the Keith, Watson, and Cugnini matters, acting on his misguided assumption that Parry did not bar his clients' claims. It appears that Parry never even entered Respondent's mind until BP raised the issue in correspondence with Respondent in fall 2011. We credit Dugan's expert testimony that a reasonable lawyer would have reviewed Parry before filing any claims against BP on behalf of members of or successors to the Parry plaintiff class, and we find that Respondent should have done so before filing these three cases. Even Respondent's own expert, Miller, testified that he

341. *Whitham Farms,* 97 P.3d at 137-38.

342. *Whitham Farms LLC v. Encana Energy Resources, Inc.,* 2004 WL 2029371 (Colo. 2004) (summarizing the issues); *see* Phillip D. Barber, *The Implied Covenants,* 1B Colorado Prac., Methods of Practice § 13:6 at n.11 (6th ed. 2016).

343. *Whitham Farms,* 97 P.3d at 138 (declining to adopt the burden-shifting approach); *Gillette,* 694 P.2d at 372 (noting that the burden is on the

lessor); 1B Stephen A. Hess, Colorado Practice, Methods of Practice § 25:5 (6th ed. 2016) (noting that "[s]tare decisis is the broad doctrine that the decisions of appellate courts should be given effect in subsequent cases in similar circumstances and that the legal principles adopted by appellate courts should not be examined anew each time a dispute arises, even in the face of a contention that the rule at issue has wrongly been decided by prior courts.").

would have gone back and re-read the Parry settlement agreement to make sure that it did not bar the Keith, Watson, and Cugnini cases. We did not find Ledbetter credible when he testified that he would not have read the Parry settlement agreement before filing a complaint on behalf of Respondents' clients.

Moreover, once Dugan brought the Parry settlement agreement to Respondent's attention in October 2011, Respondent continued to aggressively pursue his clients' claims and went so far as to request discovery in an attempt to learn BP's intent concerning the Parry settlement, contrary to the law governing the confidentiality of settlement negotiations. Respondent never stopped to investigate whether BP might have a valid argument or to investigate Parry further. In fact, he did not choose to read the Parry settlement agreement until November 2011, after the court granted BP's motion for summary judgment in Keith. Once Judge Dickinson—the same judge who presided over the Parry case and approved the settlement agreement—determined that Parry barred his Cugnini's claims, it was frivolous for Respondent to continue to make arguments to the contrary in these three cases.

We reject Respondent's contention that because no court had interpreted the settled claims clause in the Parry settlement agreement, he was advancing a novel legal issue. A settlement agreement is a binding contract, and there is a substantial body of law governing contract interpretation. Nor do we agree with his averment that the Parry settlement agreement did not release his clients' claims; rather, we agree with Dugan's expert interpretation of the plain language of the Parry settlement agreement and find that the Parry agreement unambiguously precluded his clients' claims.

Finally, we conclude that Respondent advanced frivolous appeals in all three cases. For instance, he continued to appeal the sanctions awards in Keith and Watson even after the court of appeals issued its opinion in Cugnini, affirming that the plain language of the Parry settlement agreement unambiguously barred his client's claims. Respondent thus violated Colo. RPC 3.1 by continuing to advance meritless claims and arguments in Keith and Watson when numerous district courts and another division of the court of appeals all had declared that his arguments were frivolous. He then continued stubbornly and overzealously to assert the same arguments to the same court in three separate appeals. We simply do not credit Respondent's testimony that he believed that he still could obtain favorable relief for his clients.[344] It was further frivolous for Respondent to appeal the district courts' orders granting summary judgment in Keith and Watson when it was he who failed to respond to the summary judgment motions or to present countervailing affidavits. He never presented disputed issues of fact, yet he proceeded to appeal the rulings that resulted from his failures to follow the rules of civil procedure. We also find that he advanced several appellate arguments that were nearly incoherent, raised new arguments not originally before the trial courts, and made arguments that were difficult for BP to respond to. We are unswayed by Respondent's interpretation of National Super Spuds. That case reversed an order approving a class settlement upon an objection of a class member that the settlement would have precluded claims never included in the class action complaint.[345] These facts are inapposite to the Parry settlement process—where no class member objected to the proposed settlement, including the released claims—so National Super Spuds fails to provide Respondent a good faith argument for an extension of existing law.

██ The Hearing Board is cognizant that punishment for frivolous litigation is generally left to presiding tribunals in all but the

---

**344.** See In re Foster, 253 P.3d 1244, 1258 (Colo. 2011) (finding that a lawyer's reassertion of judicial bias without any reason to expect a different result was the very definition of an objectively baseless claim).

**345.** 660 F.2d at 21.

most egregious cases.[346] But we find that this is such a case. While attorneys certainly must be zealous advocates on behalf of their clients, Respondent's stubborn advancement of his clients' claims in the district and appellate courts exceeded those bounds. Once several courts had ruled that Respondent's arguments and motions were frivolous, his repeated assertion of the arguments to the detriment of his clients, opposing counsel, and the courts was no longer in good faith. He should have known that his factual and legal claims were deficient. Accordingly, we conclude that Respondent transgressed Colo. RPC 3.1.

### Colo. RPC 8.4(d)

■ The People also allege that Respondent's aggressive pursuit of frivolous claims in Keith, Watson, and Cugnini resulted in needless litigation and thus prejudiced the administration of justice. We agree. We have determined that Respondent engaged in three separate violations of Colo. RPC 3.1, and the evidence shows that Respondent's persistence in advancing these claims resulted in unnecessary motions and appeals. Accordingly, we conclude that by continuing to litigate these frivolous claims, Respondent wasted considerable resources and thereby engaged in conduct prejudicial to the administration of justice.

### III. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* ("ABA *Standards*")[347] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[348] When imposing a sanction after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

■ *Duty*: Respondent acted in dereliction of the duties he owed to his clients by providing incompetent representation and by failing to adequately communicate with them. He breached duties he owed as a professional to the legal system by filing frivolous claims and prejudicing the administration of justice.

*Mental State*: Respondent's incompetence and advancement of frivolous claims resulted from his overzealous advocacy, stubbornness in the face of adverse rulings, inadequate preparation and expertise in oil and gas law, insufficient investigation into the facts of his clients' cases, and failure to effectively research and comprehend the relevant case law. Although we do not believe Respondent was attempting to rectify what he perceived to be grievous wrongs against his clients, he was, however, repeatedly sanctioned at every judicial level for his meritless claims and failure to follow the civil rules. Regardless of whether Respondent agreed with these judicial rulings, they were certainly enough to give a reasonable lawyer conscious awareness that continued pursuit of those claims might subject him to disciplinary sanctions.[349] Thus we conclude that Respondent should have known that he was pursuing frivolous claims and providing incompetent representation for his five clients.[350] He also knowing-

---

346. *See* Peter A. Joy, *The Relationship Between Civil Rule 11 and Lawyer Discipline: An Empirical Analysis Suggesting Institutional Choices in the Regulation of Lawyers*, 37 LOY. L.A. L. REV. 765, 806-07 (Winter 2004) (pointing to the "negligible correlation between [F.R.C.P.] 11 sanctions and reported lawyer discipline for that same conduct").

347. Found in ABA *Annotated Standards for Imposing Lawyer Sanctions* (2015).

348. *See In re Roose*, 69 P.3d 43, 46-47 (Colo. 2003).

349. *See In re Levine*, 174 Ariz. 146, 847 P.2d 1093, 1118 (1993) (finding that a lawyer knowingly abused the legal process in the face of repeated sanctions).

350. *In re Egbune*, 971 P.2d at 1073. We conclude that Respondent's incompetent representation of his five clients and his advancement of frivolous claims was done recklessly, not merely negligently, which for our purposes is equivalent to knowingly.

ly avoided communicating with the Martinez family about the risks of going forward in litigation.

*Injury*: Respondent's misconduct harmed the legal system and injured his clients. His incompetence and advancement of frivolous claims wasted judicial resources and caused BP to expend significant sums of money defending his meritless claims. Judge Wilson testified that he spent three times longer presiding over the Keith and Cugnini cases than he thought he should have spent based on his experience in oil and gas. Likewise, Judge Dickinson testified that he spent more than forty hours working on the Watson case, and he opined that the court should not have had to devote so much time to frivolous issues. Judge Cole stated that he spent the better part of two days ruling on BP's motion for summary judgment in the Watson case because Respondent's incomprehensible filings complicated his task. Finally, Judge Lass testified that his work in ruling on five or six motions in the Keith case and the sanctions hearing took more than twenty-five hours.

Respondent's misconduct also caused his clients significant financial harm. In Martinez, the district court awarded the Tribe attorney's fees and costs against Respondent and his client jointly and severally in the amount of $34,683.71. In Keith, Respondent and his client were sanctioned jointly and severally in the amount of $223,448.00 for the underlying litigation and $10,000.00 on appeal. The Watson court sanctioned Respondent's client $44,857.85. In the Martinez, Keith, Watson, and Cugnini cases, Respondent discharged his obligations in bankruptcy, leaving his clients with the balance where the award was joint and several. Respondent told the Hearing Board that he decided to file for bankruptcy, knowing his obligations would be discharged, because BP attempted to file claims against his family home. Dugan

testified at the hearing that after Respondent discharged his debt in bankruptcy, Respondent left his clients to hire new counsel to settle their debts with BP. For instance, Dugan stated, Keith lost his mineral rights in settlement of BP's sanctions award.

### ABA *Standards* 4.0-7.0—Presumptive Sanction

Suspension is the presumptive sanction for Respondent's misconduct in this case, as set forth in two ABA *Standards*. ABA *Standard* 4.52 calls for suspension when a lawyer engages in an area of practice in which the lawyer knows he or she is not competent and causes injury or potential injury to a client. ABA *Standard* 6.0 governs a lawyer's failure to bring a meritorious claim.[351] Under ABA *Standard* 6.22 suspension is warranted when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.[352]

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

 Aggravating factors are considerations that may justify an increase in the presumptive discipline to be imposed, while mitigating factors may warrant a reduction in the severity of the sanction.[353] In deciding the appropriate sanction, the Hearing Board applies three aggravating factors—two of which we accord great weight—along with two mitigating factors.

#### *Aggravating Factors*

*Pattern of Misconduct—9.22(c):* In all five cases, Respondent acted incompetently and advanced frivolous claims while representing five separate clients, demonstrating a pattern of misconduct that extended for nearly five years.[354] We consider this a significant factor in aggravation.

---

**351.** ABA *Annotated Standards* 6.2 at 314 ("[T]he following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim....").

**352.** Respondent was found to have violated C.R.C.P. 11 and C.R.S. § 13-17-101. *See In re Levine*, 847 P.2d at 1117-18 (imposing a six-month suspension on a lawyer for pursuing frivo-

lous claims and applying ABA *Standard* 6.22 for the lawyer's abuse of the legal process).

**353.** *See* ABA *Standards* 9.21 & 9.31.

**354.** *See In re MacAskill*, 163 Ariz. 354, 788 P.2d 87, 94 (1990) (applying a pattern of misconduct where "[r]espondent engaged in numerous acts of misconduct in handling several clients' mat-

*Multiple Offenses—9.22(d)*: Although Respondent engaged in multiple types of misconduct in five separate client matters, many of the rule violations were predicated on the same .facts. We thus assign this aggravator average weight in our sanctions analysis.[355]

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g)*: During his representations, Respondent himself testified that he never stopped to question his' claims or reconsider his strategy even in the face of several adverse rulings, Dugan's C.R.C.P. 11 letters, and heavy sanctions levied on his clients. At the disciplinary hearing, Respondent staunchly rejected the notion that any of his legal theories were wrong or that his reading of case law had missed the mark. Although we give Respondent some credit for admitting his violations of Colo. RCP 1.4(a) and (b), we nevertheless choose to apply significant weight to this factor in aggravation.

## Mitigating Factors

*Absence of a Prior Disciplinary Record— 9.32(a)*: Respondent has been practicing law in Colorado since 2004 with no instances of discipline, a fact that merits consideration in our analysis. We apply average weight to this factor, however, because Respondent presented little evidence of other cases he handled since becoming licensed in Colorado in 2004.[356]

*Absence of a Dishonest or Selfish Motive—9.22(b)*: We do not find that Respondent's misconduct was fueled by selfish or dishonest motives. Rather, we find that he was guided by what he perceived to be a noble and just cause, and we give him some credit for this factor in mitigation.

*Remorse—9.22(l)*: Although Respondent did not specifically ask for application of this factor in mitigation, we choose to apply average weight to this factor in light of his credible statement at the hearing that since the conclusion of his clients' cases, not a day goes by that he has not wrestled with the harm he caused his clients.

## Analysis Under ABA *Standards* and Case Law

The Colorado Supreme Court has directed us to exercise our discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[357] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases." [358] The presumptive sanction may be increased or decreased not only in light of aggravating and mitigating factors, but also in consideration of the Colorado Supreme Court's disciplinary jurisprudence.[359] Ultimately, although prior cases are helpful by way of analogy, a hearing board should determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

The People seek imposition of a one-year-and-one-day suspension, with the requirement that Respondent pay full restitution to his clients. They cite cases in which both short and substantial periods of suspension have been imposed for similar misconduct. For instance, a one-year-and-one-day suspension was imposed in *People v. Davies*, where a lawyer prepared and filed child support sheets that failed to properly reflect the parties' stipulation of joint custody.[360] The law-

ters to the injury of those clients"); *In re Reardon*, 759 A.2d 568, 577 (Del. 2000) ("A pattern may be discerned from two or more recognizably consistent acts that serve as a predictor of future misconduct.").

**355.** *See In re Thompson*, 991 P.2d 820, 822 n.1 (Colo. 1999) ("in determining the proper level of discipline, we do not simply add up the number of rules violated, but focus instead on the nature and seriousness of the conduct itself").

**356.** Although Respondent testified that he was removed from the bench in Indiana, we do not consider that to be prior discipline based on the evidence presented.

**357.** *See In re Attorney F.*, 285 P.3d 322, 327 (Colo. 2012); *In re Fischer*, 89 P.3d 817, 822 (Colo. 2004) (concluding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

**358.** *In re Attorney F.*, 285 P.3d at 327 (quoting *People v. Rosen*, 198 P.3d 116, 121 (Colo. 2008)).

**359.** *See In re Olsen*, 326 P.3d at 1011.

**360.** 926 P.2d 572, 573 (Colo. 1996).

yer's conduct was found to transgress Colo. RPC 1.1 and 8.4(d).[361] Upon consideration of the three aggravating factors, particularly the lawyer's history of discipline and failure to cooperate in the disciplinary proceedings, the Colorado Supreme Court suspended the lawyer for a year and a day, and ordered the lawyer to demonstrate an understanding the harm he caused his clients, pay restitution for that harm, and show that he was emotionally and psychologically able to practice law before being reinstated.[362]

In *In re Fisher*, the Colorado Supreme Court upheld a hearing board's determination that a lawyer incompetently represent his client by failing to take the necessary steps to secure his client's interest in her spouse's federal pension.[363] The lawyer was suspended for six months, all stayed upon completion of a two-year period of probation.[364] In *People v. Aron*, a thirty-day suspension was imposed where the attorney failed to adequately research issues involved in his client's child custody matter and failed to advise his client about criminal consequences of violating that child custody order.[365] There, the Colorado Supreme Court determined that suspension was the presumptive sanction, and applied two aggravating factors and two mitigators to arrive at a short served suspension.[366] Finally, an attorney was suspended for nine months in *People v. Smith* for filing frivolous appeals in the Tenth Circuit.[367]

We read these authorities to counsel for imposition of a lengthy suspension, particularly given the substantial and continuous nature of Respondent's incompetence, his advancement of meritless claims in these five cases, and the significant financial harm his conduct caused his clients. Additionally, Respondent presented no evidence in mitigation, and the three mitigators we apply do not outweigh the three aggravators, two of which we accord great weight. Given the

ABA *Standards'* guidance to impose a sanction that is at least consistent with, and generally greater than, the sanction for the most serious disciplinary violation, we are all the more confident that a considerable period of suspension is warranted.[368] Here, Respondent engaged in a pattern of incompetence and frivolous filings over a nearly five-year period, even in the face of numerous adverse rulings. Despite such warnings, Respondent continued to aggressively pursue his clients' claims to their financial detriment. Never once during his clients' cases did Respondent stop to consider the harm his clients were facing, and when he discharged his own obligations in bankruptcy, his clients were left with the balance. His bankruptcy also caused Keith to lose his mineral rights. With these considerations guiding our analysis, we choose to suspend Respondent for nine months, with the requirement that, should he wish to resume the practice of law, he pay his clients restitution before petitioning for reinstatement under C.R.C.P. 251.29(c).

## IV. CONCLUSION

The most important ethical duties are those responsibilities a lawyer owes to clients. Respondent violated his duties to represent his clients competently and to advance claims with a good faith basis in law and fact. Respondent's failure to observe these duties justifies a nine-month suspension, with the requirement that he pay restitution to his clients, as set forth below, before filing any petition for reinstatement under C.R.C.P. 251.29(c).

## V. ORDER

The Hearing Board therefore **ORDERS**:

1. **WILLIAM D. BONTRAGER**, attorney registration number 35359, is **SUSPENDED FROM THE PRACTICE OF LAW FOR NINE MONTHS**. The suspension will take

361. *Id.*

362. *Id.*

363. 202 P.3d 1186, 1194 (Colo. 2009).

364. *Id.*

365. 962 P.2d 261, 263 (Colo. 1998).

366. *Id.*

367. 937 P.2d 724, 731 (Colo. 1997).

368. ABA *Standards* § II at 7.

effect only upon issuance of an "Order and Notice of Suspension." [369]

2. Should he wish to resume the practice of law, Respondent **MUST** petition for reinstatement under C.R.C.P. 251.29(c).

3. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

4. Within fourteen days of issuance of the "Order and Notice of Suspension," Respondent **SHALL** comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia, to notification of clients and other jurisdictions where the attorney is licensed.

5. The parties **MUST** file any posthearing motion or application for stay pending appeal with the Hearing Board **on or before Thursday, May 11, 2017.** Any response thereto **MUST** be filed within seven days.

6. The Hearing Board **DENIES** Respondent's motion to proceed *in forma pauperis.* Respondent **SHALL** pay the

costs of these proceedings. The People **SHALL** submit a statement of costs **on or before Thursday, May 4, 2017.** Any response thereto **MUST** be filed within seven days.

7. Respondent **SHALL** pay his five clients restitution—which could include a settlement amount or a negotiated payment plan—as a condition precedent to filing any petition for reinstatement under C.R.C.P. 251.29(c). The People **SHALL** file a motion as to restitution with supporting affidavits **on or before Thursday, May 4, 2017.** Any response thereto **MUST** be filed within fourteen days.

*Original Signature on File*
LUCY HOJO DENSON
HEARING BOARD MEMBER

*Original Signature on File*
ROBERT A. MUNSON
HEARING BOARD MEMBER

[369.] In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.